TOWN OF ISLIP, Plaintiff-Appellee,

v.

EASTERN AIR LINES, INCORPORATED, Defendant-Appellant.

No. 886, Docket 85–9071.

United States Court of Appeals, Second Circuit.

Submitted Feb. 18, 1986.

Decided June 16, 1986.

Steptoe & Johnson, Washington, D.C. (Richard P. Taylor, Howard H. Stahl, Linda C. Kauskay, Washington, D.C., of counsel), Guy W. Germano, Islip Town Atty., Islip, N.Y., for plaintiff-appellee.

Gallagher & Sullivan, Mineola, N.Y., for defendant-appellant.

Before FEINBERG, Chief Judge, and LUMBARD and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

Eastern Air Lines, Inc. appeals from the entry of a judgment of civil contempt in the Eastern District, Leonard D. Wexler, J., based on Eastern's alleged willful noncompliance with a permanent injunction that Judge Wexler issued in favor of the plaintiff, the Town of Islip. The permanent injunction required Eastern to discontinue two of its six daily flights out of Islip's MacArthur Airport. Judge Wexler issued his oral ruling on November 5, 1985, and written findings of fact and conclusions of law on December 3. Eastern still had failed to cut back its schedule, however, by December 10, when the contempt order issued.

Eastern argues that the judgment of contempt was improper because the district court's injunction order failed, both in its oral form and its subsequent written form, to provide Eastern with a clear understanding of what it was legally required to do. In the alternative, Eastern argues that the contempt order was improper because it was based on a permanent injunction whose effect had been stayed by order of this court. Eastern also argues that the district court abused its discretion by "hastily" and "erroneously" issuing the contempt order. Because we agree that the district court's injunction orders contained material ambiguities, and believe that Eastern took reasonable steps to secure clarification, which was not forthcoming, we vacate the judgment of contempt.

On January 8, 1985, Northeastern Airways filed a Chapter Eleven petition in the Bankruptcy Court for the Southern District of Florida. That same day, as a part of Northeastern's nationwide reduction of flight operations, the airline discontinued its four flights at MacArthur Airport. Eastern, which already had two flights a day out of MacArthur, wanted to obtain the Northeastern slots. Discussions to that effect were held on January 8 between Arnold Aikens, Eastern's attorney, and Alfred Werner, who is Commissioner of Aviation and Transportation for the Town of Islip and also manager of MacArthur. That same day, the parties agreed that Eastern would be allowed to increase its service by taking over the four Northeastern flights; Eastern implemented the new schedule on January 9.

Islip permitted Eastern to increase its flights on the condition that it would relinquish the four flights on a one-for-one basis if Northeastern were to resume its schedule. Islip requested this one-for-one reduction condition as a means of limiting the total number of flights going in and out of MacArthur Airport. This numerical limit was expected, in turn, to help control the MacArthur noise pollution problem that has affected 3600 Islip residents, and that the Town has been attempting to cope with since April, 1984. The oral agreement was initially referred to in a January 17, 1985 letter from Islip to Eastern.

Shortly thereafter, Northeastern informed Islip that it intended to resume flights out of MacArthur, effective February 8. On February 1, Islip wrote to Eastern requesting that Eastern reduce its flights accordingly, but in a February 14 letter Eastern responded that, according to its view of the "one-for-one" agreement, such cessation was not required. Eastern's letter argued that the oral negotiations had provided that Eastern's promise to reduce its flights would be triggered only if Northeastern's resumption of operations at MacArthur was by order of the Bankruptcy Court, and at that time the court had entered no order. Islip wrote back that it disagreed with Eastern's construction of the agreement. Nevertheless, Eastern and Northeastern began simultaneous operations out of MacArthur. The dispute took

another turn on March 4, 1985, when Northeastern again suspended flights at MacArthur.

Eastern continued its flights. On June 6, 1985, Northeastern again informed Werner that it intended to resume operations at MacArthur, beginning on June 21. Islip objected to this plan, and hearings regarding the plan ensued in the Bankruptcy Court. At the same time, however, Islip requested Eastern to reduce its flights should the plan take effect, which Eastern refused to do. On June 20, the Bankruptcy Court issued an order enjoining Islip from interfering with Northeastern's resumption of one flight per day at MacArthur beginning on June 21, and a second flight per day thirty days thereafter.[1] Islip believed that the revival of Northeastern's flight status by order of the bankruptcy court satisfied even Eastern's view of the conditions precedent to the agreement, and asked Eastern to reduce its operations accordingly. Eastern again declined to do so, stating that by then it had a protected claim to the disputed slots.

On July 1, 1985, Islip brought an action against Eastern in the New York State Supreme Court, seeking an injunction requiring Eastern "to reduce its daily departures on a one-for-one basis as Northeastern increases its departures." Eastern removed the case to the Eastern District on July 24, on the basis of diversity of citizenship. The district court reviewed the documents referring to the agreement, and held a hearing on Islip's application for a preliminary injunction on August 9. Eastern's theory was that the Bankruptcy Court's June 20 order was not the kind of order that the parties had agreed would activate Eastern's promise to reduce its operations. Eastern argued that the January 8 negotiation had occurred prior to the Bankruptcy Court's resolution of claims to immediate repossession lodged against Northeastern's aircraft by its creditors. In this context, Eastern thought the parties understood that if this attempt to repossess failed, then Northeastern would be in a position to reclaim its slots. If, on the other hand, the claims succeeded, the contract's condition would be satisfied and Eastern's right to the extra slots would vest. According to Eastern, this vesting occurred on March 4, 1985, when the Bankruptcy Court ordered repossession.

Islip agreed that Eastern's promise to reduce operations would arise only by order of the Bankruptcy Court, but argued that the June 20 order had been sufficient. In Islip's view, the contractual condition was an open-ended attempt to preserve the Town's cap on flights, and accordingly *any* order of the Bankruptcy Court restoring Northeastern's flight status—whenever decided—would activate Eastern's obligation to cut back on flights. Having heard argument, the district court issued a preliminary injunction on August 9 directing Eastern "to specifically perform its agreement to reduce flights ... on a one for one basis as Northeastern flights are added pursuant to order of the U.S. Bankruptcy Court." The district court delayed the effective date of the order to September 30, 1985. Eastern appealed the grant of the preliminary injunction and, on October 4, this panel remanded the case for trial of the contract issues within 45 days; we also continued the delay of the injunction's effectiveness "until disposition of this appeal or further order of this court." Our order further directed the parties to file with our Clerk, on December 3, a written report advising us of the case's status in the district court.

After expedited discovery, the district court conducted a bench trial on November 4 and 5, 1985. Primarily through the testimony of Aikens, Eastern's attorney, the airline presented its theory that the oral agreement had provided that Eastern would have to relinquish flight slots only if Northeastern regained its slots at Islip by virtue of a Bankruptcy Court Order stemming from the then-pending repossession claims. Werner, the manager of MacArthur, presented Islip's contrary view that the agreement had called for one-for-one reduction of Eastern's flights if Northeast-

---

1. This order of the bankruptcy court was re-   versed on appeal by the Town in January, 1986.

ern should resume flying as a result of *any* Bankruptcy Court order. After the close of proceedings on November 5, Judge Wexler stated "permanent injunction granted," and directed that an order be submitted. He then stated: "For the record, so we are clear, I will come out with findings of fact and conclusions and I will ask the Town to submit findings." [2]

On the next day, November 6, Northeastern again ceased operations at MacArthur. Eastern, believing that the injunction was no longer effective even under the Town's prevailing interpretation of the agreement at trial, continued its flights at the airport; Eastern also awaited the Town's proposed findings, as well as the written order that Judge Wexler had stated would follow his ruling. By November 15, Eastern had received Islip's proposed findings—which did not address Northeastern's discontinued status at Islip—and accordingly submitted a response by affidavit to Judge Wexler. The affidavit stated objections to the proposals, and also noted Eastern's view that the permanent injunction should not have any effect because Northeastern's complete cessation of flights at MacArthur had rendered the action moot at the time it was decided.[3] Eastern argued that, because there was no longer any "one-for-one" substitution for Eastern to comply with, it need not reduce its flights, and the district court should revise its order accordingly.

On November 18, 1985, Islip responded to Eastern's papers in a letter to Judge Wexler which for the first time clearly stated Islip's position that Northeastern's flight status was irrelevant to Eastern's obligation to reduce its flights. The letter argued that Eastern should have stopped flying when Northeastern resumed in June, 1985, and therefore that Eastern had, at

that point, been divested of its right to the slots. The Town stated that Northeastern's slots, again vacant, did not belong to Eastern but instead would be filled according to a so-called "Interim Environmental Management Plan." In a letter to Judge Wexler dated November 19, 1985, Eastern described as "novel, creative and not supported by [Islip's] testimony on trial," the Town's view that Eastern no longer had any contractual right to the flight slots at MacArthur that Northeastern had vacated. Pending Judge Wexler's written order, Eastern continued to occupy the flight slots.

On December 3, 1985, Eastern filed with this court the case status report that we had requested when we delayed the effect of the preliminary injunction. Also on December 3, Judge Wexler entered his written order, supplementing his oral grant of the permanent injunction. Eastern received the order on December 5, and that same day received from Judge Wexler an Order to Show Cause, returnable in the district court on December 10, why the airline should not be held in contempt for failing to cease flights following the oral grant of the permanent injunction. On December 6, Eastern supplemented its December 3 report to this court with the additional filings that had been made in the district court since the preparation of the first report; in its covering letter, Eastern apprised us that it was going to oppose the motion for contempt before the trial court on December 10, and at the same time would move for a stay and clarification of the written order, which it still believed to be ambiguous.

Eastern's motion for a stay and/or modification pointed out that the operative para-

---

**2.** On January 7, 1986, we affirmed the permanent injunction and stayed the contempt judgment pending resolution of this expedited appeal.

**3.** Eastern also argued that the permanent injunction could not have any current effect because this court had stayed the injunction "until disposition of this appeal or further order of this court." This view was incorrect, however, because our order stayed only the effect of the *preliminary* injunction; the order could not reasonably have been construed as providing that a subsequent grant of a permanent injunction, after trial upon remand, would be ineffectual until we passed upon it. Because Eastern made no timely request that we clarify our order, its misreading of the order would be no defense to a contempt citation. Nevertheless, we vacate the judgment of contempt for other reasons.

graph in the written order, which directed the airline to "cease operating two flights daily at Long Island MacArthur Airport in accordance with its agreement with Islip," did not direct reductions of flights when Northeastern was not operating. Eastern argued—in support of modification, and in opposition to contempt—that both sides had assumed all along that, at a minimum, Northeastern would have to be *operating* at MacArthur before Eastern's obligation to reduce flights would arise. Eastern pointed out that its view of the "agreement with Islip" was perfectly reasonable in that this "one-for-one" arrangement directly addressed Islip's goal of maintaining a cap on flights out of MacArthur. Islip countered that Eastern had argued at trial that, assuming the two airlines' coexistence left the Town within its desired noise limit, then Eastern should not have to reduce flights even if Northeastern added them. Islip argued that, in rejecting this construction of the agreement, Judge Wexler had also "implicitly rejected" Eastern's "one-for-one" theory.

Judge Wexler denied Eastern's motions for a stay and for modification and, finding the airline in contempt of the court's oral and written orders, fined Eastern $1,000 for every flight in violation of the orders from November 5, 1985, until December 10. He stated that he would fine Eastern an additional $5,000 for each additional flight, until it obeyed the order by ceasing the impermissible flights altogether. Eastern discontinued the two flights on December 11, 1985.

We vacate this judgment of contempt because we believe that the district court's oral and written orders both failed to give the airline a clear understanding of what it was legally required to do, and because Eastern made reasonable efforts to seek clarification of the ambiguous orders.

Fed.R.Civ.P. 65(d) provides that "[e]very order granting an injunction ... shall be specific in terms [and] shall describe in reasonable detail ... the act or acts sought to be restrained." The Supreme Court has noted that Rule 65(d) reflects Congress'

recognition that compliance may require significant—and occasionally irreparable—changes in position, and that social harms can result when a party unwittingly transcends the bounds of a vague order. *See International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75–76, 88 S.Ct. 201, 207–08, 19 L.Ed.2d 236 (1967); *Sanders v. Air Line Pilots Ass'n International*, 473 F.2d 244, 247 (2d Cir.1972). Accordingly, before a court may use the contempt power for violation of its injunction, it must be shown that "the party enjoined [could] ascertain from the four corners of the order precisely what acts are forbidden." *Sanders, supra*, 473 F.2d at 247; *see Longshoremen's Ass'n, supra*, 389 U.S. at 76, 88 S.Ct. at 208 ("potent weapon" of contempt may not be "founded upon a decree too vague to be understood"); *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir.1971) (the "long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt").

The district court's oral ruling of November 5, 1985, stated only "permanent injunction granted." Eastern points out that this language was susceptible of several interpretations, when seen in the context of the trial evidence and the subsequent developments at MacArthur Airport. *Cf. United States v. Christie Industries, Inc.*, 465 F.2d 1002, 1007 (3d Cir.1972) (language of an injunction must be read in light of surrounding circumstances). The crucial issue at trial was whether *any* order of the Bankruptcy Court could activate Eastern's agreement to vacate slots at MacArthur, or whether—as Eastern argued in vain—the order had to have been related to the February, 1985, repossession claims. Both parties' witnesses assumed, however, that before the "one-for-one" reduction agreement took effect it required, at a minimum, that Northeastern actually resume its operations at the airport. According to one very plausible interpretation of the district court's November 5 order, Eastern was enjoined from any further breaches of its agreement not to occupy, simultaneously

with Northeastern, the subject flight slots at MacArthur.

Therefore, when Northeastern suspended all flight operations at MacArthur on the afternoon of November 5, Eastern reasonably believed that it would not violate the injunction to continue operating the two flights. Eastern was provided with no further advice as to the scope of the injunction until the district court filed its written order, on December 3, 1985, which similarly failed to clarify the central ambiguity. The court's findings of fact specifically noted that the agreement required Eastern to "relinquish its flights on a one-for-one basis" should Northeastern resume its "service at the Airport." The decretal paragraphs of the order enjoined Eastern from operating two of its daily flights "in accordance with its agreement with Islip." In light of the district court's explicit construction of the agreement, which comported with both parties' theories at trial, it was not unreasonable for Eastern to believe that the injunction had no effect while Northeastern's operations were suspended. *Cf. H.K. Porter Co., Inc. v. Nat'l Friction Products Corp.*, 568 F.2d 24, 28 (7th Cir. 1977) (Wyzanski, J., sitting by designation) ("[I]t is not enough for enforcement by contempt ... if the decree merely referred to a contract, even though the contract clearly created the legal obligation which warranted the decree.").

Eastern's noncompliance with the oral ruling, therefore, did not stem from its view that the district court had erred or abused its discretion in granting the injunction—it is well settled that an enjoined party's objections on the merits, regardless of their validity, would not justify a refusal to follow the injunctive mandate. *See United States v. United Mine Workers*, 330 U.S. 258, 293–94, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947); *Howat v. Kansas*, 258 U.S. 181, 189–90, 42 S.Ct. 277, 280–81, 66 L.Ed. 550 (1922). Rather, we attribute Eastern's continued operation of the two flights to the district court's failure to provide any clear statement of the injunction's coverage until after the December 10 hearing. *See Kammerer, supra*, 450 F.2d at 280 (ambiguities resolved in favor of one

charged with contempt). At that hearing, Islip presented its argument that Northeastern's flight status was irrelevant to the agreement because Eastern's rights had been divested by the Bankruptcy Court's June order. Apparently agreeing, the district court again enjoined the two flights, and held Eastern in contempt for having flown them in purported violation of the November 5 oral ruling. Upon receiving this unambiguous statement of its legal obligation to reduce its schedule regardless of Northeastern's operative status, Eastern immediately discontinued the two flights at issue.

Islip argues that, even if Eastern had been ignorant of the scope of the injunction, this ignorance is no defense to a judgment of contempt because Eastern failed to take reasonable steps to obtain clarification of the order. We disagree. It is true that, as we stated in *Perfect Fit Industries v. Acme Quilting Co.*, 646 F.2d 800 (2d Cir. 1981), "a party to an action is not permitted to maintain a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt." *Id.* at 808. Whereas the enjoined party in *Perfect Fit* took virtually no steps to obtain a copy of what it knew to be an unfavorable order, however, Eastern here actively sought clarification of the injunction.

When the district court issued its oral ruling on November 5, it stated that, "so we are clear," a written order would be prepared laying out the findings and conclusions. The court also directed Islip to prepare proposed findings of fact and conclusions of law. That same day, however, Northeastern suspended operations, which—in light of the parties' trial theories—caused Eastern justifiable confusion over whether the injunction was effective. Eastern reasonably assumed that Islip, then preparing its proposed findings, would immediately respond to what the airline perceived to be a crucial new development, perhaps by calling to the court's attention the essentially moot status of the dispute at that time. The airline, therefore, awaiting some imminent action by Islip, made no contacts with, or motions in, the court.

When Eastern received Islip's proposed order, it discovered that Islip had ignored Northeastern's suspension at MacArthur, evidently believing it to be irrelevant. Promptly thereafter, on November 15, Eastern's counsel sent the court an affidavit in opposition to the proposed order arguing, *inter alia,* that Northeastern's status was at the heart of the agreement and that the dispute had thus been moot at the time of the court's initial order. Islip responded in a letter to the court, explicitly stating for the first time its view that Northeastern's discontinued status was irrelevant to Eastern's obligation to vacate slots at MacArthur.

Eastern, having explained its position to the court, made no further efforts to seek clarification until December 5, when it received the court's December 3 written order, as well as the order to show cause why the airline should not be held in contempt for having continued the two flights. On December 6, Eastern notified this court by letter that it intended immediately to file a motion for a stay and/or clarification of the court's order, to be argued on December 10, the same day as the contempt hearing. At that hearing, Eastern finally was unambiguously apprised that it must cease its two flights immediately, despite Northeastern's continued suspension. It did so the next day.

In these circumstances, we cannot agree that Eastern attempted to maintain a "studied ignorance" of the scope of the injunction. On the contrary, as soon as it was aware that Islip was altering its trial theory as a reaction to Northeastern's discontinuation at MacArthur, Eastern sent the court a lengthy affidavit explaining its position that the injunction had no effect because, among other reasons, it was based on a dispute that no longer existed. Upon receipt of the court's unfavorable response to its view of the injunction, Eastern immediately moved for stay and/or clarification; when these motions were denied, Eastern complied with the injunction. We believe that Eastern was "reasonably diligent and energetic" in attempting to comply with what amounted to a fundamentally ambiguous order. *See EEOC v. Local 638, Sheet Metal Worker's International Ass'n,* 753 F.2d 1172, 1178 (2d Cir.), *cert. granted,* —— U.S. ——, 106 S.Ct. 58, 88 L.Ed.2d 47 (1985).

The judgment of contempt is vacated.

Islip has made requests for attorneys' fees on three bases. First, Islip seeks fees to redress Eastern's purported misconduct in the district court before and through issuance of the permanent injunction, the appeal of which carried our docket no. 85–7995. Second, Islip requests that it be reimbursed for its fees relating to Eastern's appeal of the grant of the permanent injunction. Third, Islip requests the fees associated with the Town's prosecution of the contempt order that we have herein vacated, including the cost of defending this appeal, which carries the docket No. 85–9071.

Islip's first request for fees is not properly before us. We deny the second request because, although we affirmed the grant of the permanent injunction, we disagree with Islip's argument that Eastern brought the appeal "vexatiously" or in bad faith. As we have vacated the contempt judgment, we accordingly deny Islip's third request for the costs of prosecuting the contempt order.