In re STEIN AND DAY INCORPORAT-
ED, a/k/a Stein and Day/Publishers,
Debtor.

STEIN AND DAY
INCORPORATED, Plaintiff,

v.

COORDINATED SYSTEMS AND
SERVICES CORPORATION,
Defendant.

Bankruptcy No. 87 B 20300.
Adv. No. 87-6137.

United States Bankruptcy Court,
S.D. New York.

Feb. 16, 1988.

Barr and Faerber, Spring Valley, N.Y., for debtor.

Ross and Hardies, New York City, for CSSC.

## DECISION ON ORDER TO SHOW CAUSE TO PUNISH FOR CONTEMPT

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

This Chapter 11 debtor, Stein and Day Incorporated, seeks an order holding its warehouse, Coordinated Systems and Services Corporation ("CSSC"), in contempt for the violation of a stipulation between the parties that was "So ordered and approved" by this court on September 30, 1987. CSSC asserts that it did not violate the terms of the stipulation and that it used its best efforts to fill shipping orders for books which were published by the debtor and stored in CSSC's warehouse in Edison, New Jersey. The stipulation which was "So ordered and approved" by this court on September 30, 1987 reflected the settlement of an adversary proceeding commenced by the debtor, a publisher of books, against CSSC, a warehouse business which specialized in the storing and shipping of books for book publishers to their jobbers, retail stores and other trade outlets. CSSC had withheld book shipments on behalf of the debtor because of unpaid prepetition shipping and storage charges which formed the basis for CSSC's warehouseman's first

lien on the debtor's inventory. Hearings were held on February 1, 3, and 4, 1988. The case was fully submitted on February 11, 1988.

## FINDINGS OF FACT

1. On June 25, 1987, the debtor filed with this court its petition for reorganizational relief under Chapter 11 of the Bankruptcy Code and continued in the management of its business and property as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2. The debtor is engaged in the business of publishing hardcover, trade paperback and mass market paperback books, with its principal place of business located in Westchester County, New York.

3. More than ninety percent of the debtor's current inventory of books is stored at CSSC's facilities in Edison, New Jersey. CSSC stored the debtor's inventory and shipped the books as were ordered by the debtor or its distributor, Henry Holt and Company ("Holt").

4. Pursuant to a written agreement between the debtor and CSSC, dated April 22, 1987, CSSC is to provide to the debtor data processing, inventory, record keeping, warehousing shipping and other related services. Under this agreement CSSC is to pick, pack and ship books in the debtor's catalogue in accordance with orders received from the debtor or the debtor's distributor, Holt, for distribution within the United States.

5. CSSC refused to pick, pack and deliver books for the debtor or the debtor's distributor, Holt, because of the debtor's failure to pay prepetition storage and shipping charges which were overdue. Without these books being shipped, the debtor could not collect from its customers the accounts receivable generated by the sale of the debtor's books, with the result that the debtor could not meet its own obligations and payroll commitments.

6. On July 23, 1987, the debtor commenced an adversary proceeding against CSSC because of CSSC's refusal to ship the debtor's books to customers. This adversary proceeding was settled pursuant to a stipulation entered into between the debtor, CSSC, the attorneys for the creditors' committee and the attorneys for two secured creditors. The stipulation was "So ordered and approved" by this court on September 30, 1987.

7. The stipulation provides that after the payment from the debtor to CSSC as agreed to between the parties, CSSC would begin to ship books from its Edison, New Jersey warehouse, in accordance with the April 22, 1987 warehouse agreement, and would immediately begin to process and fill the orders which it had on hand, together with all other orders from the distributor, Holt, based upon instructions from Holt or the debtor. It was further stipulated:

CSSC shall use its best efforts to promptly ship each order within two (2) working days after the date the invoice/packing list is received by CSSC. CSSC will advise Debtor of any shipping delays within said two working day period.

8. The stipulation also provides:

16. If any party to this stipulation asserts that there is a breach of the terms of this stipulation then the party asserting the breach shall notify all other parties of the alleged breach.

\* \* \* \* \* \*

17. All notices, including copies thereof and other communications hereunder, shall be in writing and delivered by hand, by first class registered or certified mail, return receipt requested, postage prepaid, or by telex, telecopy or other telegraphic or telephonic means, to the parties at their respective addresses....

A complete copy of the stipulation is annexed as an appendix to this decision.

9. Following the execution of the stipulation which the court "So ordered and approved" on September 30, 1987, the debtor and Holt commenced sending orders to CSSC for shipment to customers. There are three categories of book orders involved. One category relates to telephone orders which usually pertain to small quantities of books which must be shipped on an expedited basis. A second category of book orders involves the normal bulk sales,

which are usually submitted by the distributor, Holt. The books are shipped to bookstores throughout the country. The third category of book orders, referred to as remainder sales, involve large volumes of books which are sold at discount or reduced prices to certain firms specializing in remainder sales.

10. According to CSSC's records the first order that it received for shipment of the debtor's books after the stipulation was "So ordered and approved" by this court on September 30, 1987, was an expedited order dated October 15, 1987, which was shipped the same day. [Exhibit A]. Between October 15, 1987 and December 28, 1987, CSSC received forty-four expedited orders for the debtor's books and shipped all but three within two days. The expedited orders on November 19, 1987 were shipped on November 24 and 30, 1987. One expedited order received by CSSC on November 25, 1987 was shipped on November 30, 1987.

11. The evidence reveals that all of the expedited telephone orders that CSSC received from the debtor were fully shipped by CSSC. In October of 1987, CSSC shipped 2,642 books pursuant to telephone orders. In November of 1987, CSSC shipped 6,894 books on an expedited basis. In December of 1987, CSSC shipped 4,023 books pursuant to telephone orders.

12. As to the normal bulk sales orders which were submitted to CSSC by the debtor's distributor, Holt, there were delays, partly due to the fact that CSSC had difficulty filling orders just before the Christmas Season in December, when 25 of their 50 employees at the warehouse were absent from work for one reason or another, including vacations. The orders which Holt had submitted to CSSC in May and June of 1987 were returned to Holt by CSSC after the execution of the September 30th stipulation so that Holt could resubmit new invoices to the customers because the orders were stale and had to be reinvoiced. Thereafter, CSSC shipped the books pursuant to the resubmitted Holt orders. However, Holt would not make payments to the debtor until Holt received confirmations for the shipments by CSSC. This process was delayed because it was the practice of CSSC's employees to put the confirmations in a box. CSSC did not submit the box of confirmations to Holt until after the box of confirmations was filled. Holt received two boxes of confirmations from CSSC. The first box had some May and June orders in it as well as orders from September and October of 1987. The second box contained mainly November, 1987 orders, together with some May and June orders. Thus, Holt informed the debtor that it could not pay for orders approximating $196,000 until it received the confirmations from CSSC.

14. CSSC conceded that most of the remainder orders had not been shipped. A partial order was shipped, but it contained some incorrect items which should not have been included in the shipment. CSSC's acting warehouse manager testified that he informed the debtor's representatives in mid-December, 1987 that CSSC could not work on the remainder orders until after January 4, 1988, because CSSC employees were absent during the pre-Christmas working days. In any event, he said that it was standard practice in handling remainder orders that these orders were attended to only after all other orders were filled. He said that normally remainder orders could sit around for a month because remainder orders are filled on a time and material basis; they are not released until CSSC has the payment up front.

15. CSSC's president testified that remainder sales are large volume orders sold at reduced prices and are processed at a reduced fee as an accommodation to the publisher. These sales are filled by the warehouse at cost, based upon time and materials. Therefore, they do not receive priority attention and the publishers are aware of this fact. He said that the debtor's remainder orders were handled by CSSC no differently than in the past. In fact, CSSC's president testified that the debtor used to provide CSSC with an advance forecast of anticipated remainder shipments and that this forecast was crucial in the handling of remainder orders. CSSC's president testified that CSSC had

never before received remainder orders from the debtor for shipping as many as 175,000 books in one month as was received from the debtor in December of 1987. Additionally, the debtor's orders were not on CSSC's computer system because the debtor wanted to use its own computer hardware.

16. CSSC's acting warehouse manager testified that he had never seen a copy of the September 30, 1987 stipulation and that nobody at CSSC had every told him that CSSC was required to use its best efforts to fill the debtor's orders within two working days after each order is received by CSSC. He did say, however, that his superiors advised him to rush the debtor's orders for shipment.

17. CSSC's comptroller testified that the confirmations and weekly freight invoices were transmitted to the debtor's distributor, Holt, on a weekly basis.

18. CSSC's acting warehouse manager testified that no one from the debtor ever complained to him about a lack of confirmations. CSSC's president testified that at no time did Holt ever complain about having a problem concerning shipping confirmations. He also said that CSSC did not do anything differently in the handling of the debtor's orders.

19. CSSC's general counsel testified that he had heard from one of the debtor's attorneys concerning the remainder orders. The debtor's attorney had inquired as to whether CSSC had any payment problems concerning the debtor, but that the debtor's attorney did not give him any specific target dates with respect to shipping the remainder orders. He did speak to a CSSC supervisor about the need to ship the remainder orders. However, the supervisor did not contact the debtor. Instead, the supervisor telephoned the remainder customer, Publishers Outlook, to explain the delay in shipment.

20. The sales director for Holt testified that he never discussed the shipment of Holt's orders with anyone at CSSC. He said that he is still waiting for some confirmations from CSSC because Holt will not pay the debtor until it has confirmations of shipments to customers; at which time Holt will know how much it must pay to the debtor.

21. The debtor's representatives testified that the debtor is still missing 300 shipping vouchers due CSSC and that no shipping vouchers had been received from CSSC in January of 1988. When the debtor's administrative editor telephoned CSSC's acting warehouse manager or his secretary about discrepancies and books missing from shipments, she was advised that they would get back to her, but often they did not call back. However, the debtor's administrative editor never complained to CSSC about not having received shipping confirmations.

22. CSSC did attempt to compile an inventory of the debtor's books in the warehouse and recorded this information on inventory tags. In the pre-Chapter 11 period, the debtor's auditors used to assist in the inventory work by explaining discrepancies. CSSC sent the inventory tags to the debtor's attorneys who used their computer to generate a working inventory list. Some items on the inventory tags were missing, such as quantity, locations and book numbers. CSSC's president said that the missing information was only intended for the benefit of the warehouse people and that the missing items need not be communicated to the warehouse customers. He said that the information as to location was not necessary because all of CSSC's people knew that the debtor's books were located in CSSC's picking bin.

23. There was no evidence of any written notices from the debtor asserting that CSSC breached any of the terms of the September 30, 1987 stipulation, as required for in paragraphs # 16 and # 17 of the stipulation, until it served CSSC with its show cause order for contempt.

24. There was evidence of a lack of communications between the debtor and CSSC, and between CSSC's management and its employees. There was also evidence of delays in shipping remainder orders and delays in providing the debtor and its distributor, Holt, with copies of confirmations of shipments. The confirmation

delays were caused by the questionable practice of CSSC's warehouse people holding on to the box of confirmations until the box was filled. There was also evidence of delay in the compilation of a physical inventory and discrepancies in shipments.

## DISCUSSION

There is some disagreement as to whether a bankrupty judge may exercise civil contempt power. Based on Congress' intent in the 1984 Amendments to cure the overly broad jurisdictional grant to bankruptcy judges in the 1978 Bankruptcy Reform Act, the Ninth Circuit Court of Appeals concluded that bankruptcy judges have no jurisdiction to issue contempt orders, but must certify the facts to the district court to review *de novo* and determine whether to issue an order of contempt. *Plastiras v. Idell (In re Sequoia Auto Brokers, Ltd., Inc.)*, 827 F.2d 1281 (9th Cir.1987). However, effective August 1, 1987, Bankruptcy Rule 9020 was amended. Subsection (b), which deals with criminal or civil contempt committed out of the presence of the bankruptcy judge, provides as follows:

(b) **Other Contempt.** Contempt committed in a case or proceeding pending before a bankruptcy judge, except when determined as provided in subdivision (a) of this rule, may be determined by the bankruptcy judge only after a hearing on notice. This notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense. The notice may be given on the court's own initiative or an aplication of the United States Attorney or by an attorney appointed by the court for that purpose. If the contempt charged involves disrespect to or criticism of a bankruptcy judge, that judge is disqualified from presiding at the hearing except with the consent of the person charged.

It should be noted that this rule does not authorize a bankruptcy judge to *punish* for contempt, but merely authorizes the bankruptcy judge to *determine* contempt.

In a recent case, Bankruptcy Judge Paskay, noted that the 1987 Amendments eliminated subclause (3) of Bankruptcy Rule 9020, which previously authorized certification to the district court for criminal contempt, as suggested by the Ninth Circuit in the *Sequoia* case. *In re Miller*, 81 B.R. 669, 16 B.C.D. 1187 (Bankr.M.D.Fla.1988). Accordingly, Judge Paskay concluded that the bankruptcy court may order sanctions for civil contempt committed out of the presence of the court.

Prior to the decision of the Ninth Circuit Court of Appeals in the *Sequoia* case, various bankruptcy courts had concluded that they were authorized to exercise the power of civil contempt to effectuate court orders despite the fact that they were not Article III courts. *In re Haddad*, 68 B.R. 944 (Bankr.D.Mass.1987); *In re McLean Industries, Inc.*, 68 B.R. 690 (Bankr.S.D.N.Y. 1986); *In re Elegant Concepts Ltd.*, 67 B.R. 914 (Bankr.E.D.N.Y.1986); *In re LH & A Realty, Inc.*, 62 B.R. 910 (Bankr.D.Vt. 1986); *In re Crabtree*, 39 B.R. 702 (Bankr. E.D.Tenn.1984). On the other hand, some district courts had stated that the civil contempt power is an essential attribute of Article III courts that may not be delegated to bankruptcy courts. *In re Continental Air Lines, Inc.*, 61 B.R. 758, 773 (S.D. Tex.1986); *In re Industrial Tool Distributions, Inc.*, 55 B.R. 746, 751 (N.D.Ga.1985); *In re Omega Equipment Corp.*, 51 B.R. 569, 573 (D.C.1985); *In re Mab Foods, Inc.*, 49 B.R. 73 (E.D.N.Y.1985). Other district courts had concluded that bankruptcy courts did possess the authority to punish for civil contempt. *Kellogg v. Chester*, 71 B.R. 36 (N.D.Tex.1987); *Better Homes of Virginia, Inc. v. Budget Service Co.*, 52 B.R. 426 (D.Va.1985) *aff'd* 804 F.2d 289 (4th Cir.1986).

The uncertainty as to the bankruptcy judge's authority to enter a final order of contempt is addressed by new Bankruptcy Rule 9020(c), effective August 1, 1987, which provides that if objections to a bankruptcy judge's contempt order are filed within ten days after its entry a *de novo*

review is available in the district court under Bankruptcy Rule 9033, which deals with appeals from proposed findings of fact and conclusions of law in non-core proceedings. The *de novo* review specified in Subsection (d) of Rule 9033 is in marked contrast with the standard of review under Bankruptcy Rule 8013, which provides that a bankruptcy judge's rulings "shall not be set aside unless clearly erroneous." Thus, Rule 9020(c) appears to strip the bankruptcy court of its power to punish for contempt by side-stepping constitutional issues through the use of a procedural rule.

In order to avoid unnecessary and costly litigation concerning the court's authority to punish for civil contempt, the court will follow the expedient path of addressing the issue in the context of determining whether or not CSSC has failed to comply with the stipulation which was "So ordered and approved" on September 30, 1987, so as to warrant the issuance of a certification of facts to the district court for an order of contempt.

## CONTEMPT

■ Before a party can be held in civil contempt for disregarding a court order, it must be shown that there exists an enforceable order that is clear and specific which unambiguously commands such party to perform or refrain from performing in accordance with the order. *International Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 77, 88 S.Ct. 201, 208–09, 19 L.Ed.2d 236 (1967); *Town of Islip v. Eastern Airlines, Inc.*, 793 F.2d 79 (2d Cir.1986); *H.K. Porter Co., Inc. v. National Friction Products*, 568 F.2d 24 (7th Cir.1977). Proof of a party's noncompliance with a court order must be established by "clear and convincing evidence." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir.1981).

■ Parties to a litigated matter may resolve their dispute by entering into a stipulation which obligates one or more of the parties to perform, or refrain from performing, specific acts. If the parties submit such stipulation to the court and it is "So ordered and approved" by the court, the noncompliance by one of the parties with such stipulation may give rise to a contempt order because a "So ordered" stipulation has a double aspect both as a contract and as a court order. *International Distribution Centers v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 727 (S.D. N.Y.1986); *United States v. Board of Education of the City of Chicago*, 588 F.Supp. 132, 239 (N.D.Ill.1984); *In re Haddad*, 68 B.R. 944 (Bankr.D.Mass.1987).

■ The evidence in the instant case clearly and convincingly shows that CSSC used the "So ordered and approved stipulation" dated September 30, 1987 as an opportunity to collect the prepetition debts owed to it by the debtor. CSSC asserted a warehouseman's lien against the debtor's inventory of books in its possession and refused to ship any books unless it received payment from the debtor. The debtor had previously entered into a cash collateral order with two secured creditors who also asserted liens on the debtor's inventory. In order for the debtor to generate cash collateral it was necessary for the debtor to resolve its pending litigation with CSSC with respect to the release of the debtor's books in the CSSC warehouse. The debtor and the two secured creditors anticipated that a settlement of the dispute with CSSC would enable the debtor to keep alive financially by the receipt of cash payments from customers to whom the debtor's books were shipped. If CSSC failed to ship the books promptly upon the receipt of orders from the debtor or its distributor, Holt, the resulting delayed payment from the customers would produce disastrous results for the debtor and would frustrate expectations of the debtor's two secured creditors who consented to the debtor's use of cash collateral in the belief that their secured claims would be reduced by the payments from the debtor's customers.

The debtor negotiated a settlement of its litigation with CSSC and agreed to pay its prepetition obligations to CSSC in the expectation that CSSC would use its best efforts to ship normal bulk orders submitted by the distributor, Holt, and the

large volume of remainder orders negotiated by the debtor in an effort to raise cash. It was understood by the parties that CSSC had on hand unshipped orders previously submitted by Holt. CSSC returned to Holt the unshipped orders which had to be reinvoiced and resubmitted by Holt for shipment by CSSC. Additionally, the debtor attempted to raise much needed cash by selling large quantities of its inventory at reduced or discounted prices to remainder dealers. Prompt delivery of these orders was an essential ingredient in the debtor's plan for survival, especially in the light of the debtor's cash collateral order. Hence, the debtor relied upon CSSC's stipulated commitment to "use its best efforts to promptly ship each order within two (2) working days after the date the invoice/packing list is received by CSSC." CSSC's obligation to comply with this stipulation was formalized as a court-ordered command in settlement of the pending adversary action when the imprimatur of the court was affixed to the stipulation between the parties as "So ordered and approved" on September 30, 1987.

CSSC exhibited so little good faith or intention to use its best efforts to comply with the two-day shipping obligation, that it never even bothered to communicate this requirement to its acting warehouse manager. Nor did CSSC "advise Debtor of any shipping delays within said two working day period" as required under the stipulation. CSSC never informed the debtor that 25 of its 50 employees would not be available in the pre-Christmas period to handle remainder orders and that no bulk or remainder shipments would be made before January 4, 1988, until the debtor's employees called in mid-December and its attorney called to inquire as to whether CSSC's delay was due to any money problems with the Debtor. The delays in sending confirmations to Holt, which prompted Holt to hold back on payments to the debtor until after such confirmations were received by Holt, reflected a nonchalant attitude by CSSC as to its obligations under the "So ordered and approved" stipulation. CSSC's acting warehouse manager testified that confirmations were not forwarded to Holt or to the debtor until the box in which they were placed was full.

The evidence in this case is clear and convincing that after CSSC satisfied its prepetition claims, following the execution of the stipulation which settled the pending litigation between CSSC and the debtor, CSSC failed to use its best efforts, as required under the "So ordered and approved" stipulation, to ship the debtor's inventory within two working days after receipt of an invoice, or to advise the debtor "of any shipping delays within said two working day period." Indeed, CSSC's conduct reflects a callous contempt of the "So ordered and approved" stipulation so as to warrant the following certification:

## CERTIFICATION OF CONTEMPT

HOWARD SCHWARTZBERG, Bankruptcy Judge in the above entitled case, does hereby certify that upon application of the debtor, Stein and Day Incorporated, and after hearings held on February 1, 2 and 4, 1988, at which both the debtor and Coordinated Systems and Services Corporation appeared by their attorneys, and presented evidence upon which the foregoing FINDINGS OF FACT were based, I respectfully certify to the following CONCLUSIONS;

1. Although the stipulation between the parties which was "So ordered and approved" by this court on September 30, 1987, does not require that all shipments of the debtor's books should be made within two days after the invoice is received by CSSC, such stipulation does mandate that CSSC shall "use its best efforts" to accomplish this result. Based on the foregoing FINDINGS OF FACT, this court certifies to the district court that CSSC did not "use its best efforts to promptly ship each order within (2) working days after the date the invoice/packing list is received by CSSC."

2. This court certifies that CSSC knew before it signed the stipulation that except for expedited orders, it was not CSSC's practice to ship bulk orders and remainder orders within two days of the receipt of invoices. Nonetheless, the so ordered stip-

ulation makes no exceptions for bulk orders or remainder orders.

3. It is further certified that CSSC was prompted to enter into the stipulation in order to obtain payment of all of its prepetition claims against the debtor and in order to establish an escrow fund which would satisfy its warehouseman's liens against the debtor's inventory.

4. It is certified that CSSC failed to use its best efforts to ship bulk orders and remainder orders within two days of the receipt of invoices from the debtor. One of the reasons for such failure is the fact that CSSC never informed its warehouse manager of the two-day requirement and never gave him a copy of the stipulation dated September 30, 1987.

5. It is certified that CSSC failed to use its best efforts when it failed to submit timely confirmations to the debtor's distributor, Holt, but instead, allowed such confirmations to accumulate in boxes until the boxes were filled, despite the fact that Holt would not pay the debtor until it received the shipping confirmations.

6. It is certified that CSSC failed to use its best efforts when it failed "to advise Debtor of any shipping delays within said two working day period" as required by the stipulation. The belated information which CSSC furnished to the debtor's representatives in midDecember, 1987 that due to Christmas absences, no shipments would be made until after January 4, 1988, does not absolve CSSC from the stipulated duty of advising the debtor as to the other delays in shipping since September 30, 1987.

7. It is certified that CSSC knew that it would receive large volumes of orders from the debtor's distributor, Holt, immediately after the execution of the so ordered stipulation because the large backlog of shipping invoices held by CSSC dating back to May and June of 1987, were returned to Holt for reinvoicing and resubmission to CSSC. Nonetheless, CSSC failed to advise the debtor of any shipping delays.

8. It is certified that the debtor is entitled to compensation for CSSC's failure to comply with the so ordered stipulation dated September 30, 1987.

The foregoing FINDINGS OF FACT and CONCLUSIONS as to CSSC's civil contempt are hereby certified to the United States District Court for the Southern District of New York.

## APPENDIX

## STIPULATION AND ORDER

RECITALS:

A. On June 25, 1987 (the "Filing Date"), the Debtor STEIN AND DAY INCORPORATED (the "Debtor" or "Stein and Day") filed a petition for reorganization (the "Petition") under Chapter 11, § 301 of the Bankruptcy Code (the "Code") with this Court. The Debtor has continued in the management of its business (subject to authorized cash collateral restrictions) and properties as debtor in possession pursuant to §§ 1107 and 1108 of the Code.

B. An official committee of unsecured creditors (the "Committee") has been appointed herein and is acting in this case.

C. On July 23, 1987, the Debtor commenced the above captioned adversary proceeding against the defendant Coordinated Systems & Services Corporation (referred to herein as the "Defendant" or "CSSC").

D. CSSC has asserted claims against the Debtor for Pre–Petition shipping, storage and other charges, which claims are asserted by the Defendant to constitute a warehouseman's first lien on the inventory hereinafter described.

E. A substantial portion of the Debtor's current inventory is presently in the possession, custody and control of CSSC and located at defendant CSSC's facilities in Edison, New Jersey (herein the "Edison Inventory").

F. Prior to the Filing Date, CSSC stored the Edison Inventory pursuant to a certain agreement between CSSC and the Debtor dated April 22, 1987 (the "Agreement"), a copy of which Agreement is annexed hereto as Exhibit "A".

G. As of the Filing Date, the Debtor had incurred charges on account of storage and shipping, together with other claims

asserted by CSSC under the Agreement, which charges and other claims the Debtor disputed.

H. Against said charges and claims, CSSC holds the Edison Inventory pursuant to its asserted warehouseman's lien. The Debtor believes that the value of the Edison Inventory is substantially greater than any claim held by CSSC.

I. CSSC has not shipped or processed any orders for the Debtor's books from the Edison Inventory since prior to the Filing Date.

J. The Edison Inventory is also subject to the asserted security interests and liens granted by the Debtor to Michigan National Bank ("Michigan National") and Book-Crafters U.S.A., Inc. ("BookCrafters").

K. The Debtor's distributor is Henry Holt & Co. ("Holt"). Under its arrangement with the Debtor, Holt solicits, from its customers, orders for books published by the Debtor, and transmits such orders to CSSC for processing and shipment. Holt bills its customers directly for all books so ordered; and, approximately 120 days after the orders are placed, remits to the Debtor an amount equal to the aggregate amount due from Holt's customers for such orders less (a) a 25% reserve for returns, and (b) Holt's commission of 20% of the remaining 75% of such aggregate amount (all such payments resulting from the sale of books after the date of this stipulation from the Edison inventory due to the Debtor from Holt being hereinafter referred to, collectively, as the "Holt Receivables"). The Holt Receivables are due and payable to the Debtor irrespective of whether or not Holt has been paid by its customers for such orders.

L. The parties desire to reach a consensual resolution regarding the within adversary proceeding.

IT IS THEREFORE STIPULATED AND AGREED by and between the parties hereto as follows:

1. During each month in which CSSC performs services for the Debtor and except as may be otherwise provided herein, CSSC and the Debtor shall perform their respective obligations under the Agreement. In the event, however, the Debtor fails to make the payments required hereunder in a timely manner, CSSC shall not be obligated to perform its obligation hereunder, but CSSC shall resume performance when payments are made. Upon and after payment as set forth in paragraphs 2, 3 and 4 hereof, applying the $11,272.21 credit referred to in paragraph 7 hereof, CSSC shall forthwith begin to ship books from the Edison Inventory in accordance with the terms of the Agreement; and shall immediately begin to process and fill the orders therefor which it presently has on hand, together with all other orders as it may receive from Holt, and/or the Debtor or its authorized representative upon the terms and conditions set forth herein and based upon the instructions of Holt and/or the Debtor. CSSC shall use its best efforts to promptly ship each order within two (2) working days after the date the invoice/packing list is received by CSSC. CSSC will advise Debtor of any shipping delays within said two working day period.

2. All storage charges for the Edison Inventory for the months of August, 1987 and September, 1987 shall be paid to CSSC by Stein and Day in accordance with paragraph 7 of this stipulation, and all storage charges for the Edison Inventory for subsequent months shall be paid to CSSC by Stein and Day, in advance, such storage charges to be calculated in accordance with the Agreement.

3. In addition to the storage charges referred to in paragraph 2 hereof, (a) all Post–Petition shipping charges shall be paid to CSSC by Stein and Day, in advance, at the rates prescribed in the Agreement;

and (b) all post-Petition receiving and other charges set forth in the Agreement (other than the charges referred to in paragraph 4 hereof which shall be dealt with in accordance with the terms of said paragraph 4) (the "Receiving and Other Charges") will be paid, at the rates prescribed in the Agreement to CSSC, in advance, out of the revolving credit balance which Stein and Day shall maintain at CSSC (the "Stein and Day Credit Balance"), which Stein and Day Credit Balance shall be replenished by Stein and Day to maintain a balance of $1,000.00, which $1,000.00 credit balance shall, in the first instance, be established by applying a portion of the $11,272.21 credit balance referred to in paragraph "7" hereof, provided, however, in the event that the Stein and Day Credit Balance shall, at any point in time, not be sufficient to reimburse CSSC for anticipated Receiving and Other Charges, such Receiving and Other Charges shall be paid to CSSC by Stein and Day, in advance, until the Stein and Day credit balance shall have been replenished.

4. All Post–Petition, out-of-pocket freight costs for books to be shipped, including, but not limited to, United Parcel Service, Federal Express, trucking and postage charges (the "Freight Costs") will be paid to CSSC, in advance, out of the revolving credit balance maintained at CSSC by Holt (the "Holt Credit Balance"), and Stein and Day shall use its best efforts to cause the revolving Holt Credit Balance to be replenished by Holt as needed to maintain a balance of $10,000.00. The failure of Holt to maintain the Holt Credit Balance shall not be deemed a breach of this Stipulation; provided, however, that in the event that the Holt Credit Balance shall, at any point in time, not be sufficient to reimburse CSSC for anticipated Freight Costs, such Freight Costs shall be paid to CSSC by Stein and Day, in advance, until the Holt credit balance shall have been replenished by Holt.

5. All proceeds of the sale of the Edison Inventory (including, but not limited to the Holt Receivables) generated from and after the date of the approval hereof shall be deposited into and held in a separate, interest bearing, escrow account, (the "Escrow Account") maintained by Stein and Day, with CSSC's lien and all other valid liens and security interests attaching to such proceeds and to any returns of books shipped from the Edison Inventory (such proceeds and returns being hereinafter referred to, collectively, as the "Edison Proceeds"). There shall be no disbursements from said Escrow Account, except: (a) as provided herein; (b) upon the written consent of the parties hereto until such time as CSSC shall have been paid in full in accordance with this Stipulation, and thereafter CSSC shall not be a necessary consenting party; or (c) pursuant to order of the Court. There shall be no liens or security interests in the Edison Inventory, the Edison Proceeds or Escrow Account senior to the interests of the existing lienholders. The party maintaining the Escrow Account shall provide monthly reports to CSSC, the Committee, Michigan National and Book-Crafters.

6. CSSC will be paid from the Escrow Account (from the first proceeds deposited therein resulting from sales of books from the Edison Inventory) the sum of $5,310.00, representing the full amount of its storage charges for the period from June 25, 1987 (the Filing Date) through and including July 31, 1987.

7. CSSC is hereby allowed a Pre–Petition secured claim in the amount of $68,-500.00, which claim is secured by a lien in the Edison Inventory, the Edison Proceeds and the Escrow Account and shall include any and all charges which were asserted or could be asserted by CSSC against the Debtor or the Edison Inventory under the Agreement, including without limitation claims for storage, shipping, minimum charges or interest to the Filing Date; and CSSC hereby waives and releases any claim

it may hold against the Debtor for any period, either prior to or after the Filing Date, for the minimum payment referred to in paragraph 8 of Schedule "A" to the Agreement. CSSC and the Debtor agree that the sum of $11,272.21, representing the proceeds of the receivable of Book Sales, Inc. which had been assigned to CSSC by the Debtor prior to the Filing Date, shall be retained by CSSC and applied as a credit against August, September and future storage charges and other charges going forward from the date of this Stipulation.

8. CSSC shall be paid and it shall accept the sum of $68,500.00 in full settlement, satisfaction, release and discharge of all Pre–Petition claims, whether secured or unsecured, as allowed by paragraph 7 hereof.

9. The Escrow Account shall be disbursed as follows:

(a) CSSC, immediately upon the Escrow Account having sufficient proceeds, shall be paid the storage charges as provided in paragraph 6 hereof;

(b) CSSC thereafter shall be paid one-third (⅓) of the Edison Proceeds as soon as practicable after such proceeds are received and available until the sum of $68,-500.00 has been paid in full; and

(c) The balance of the Edison Proceeds shall be held or paid as provided in paragraph 10 hereof.

10. All funds deposited into the Escrow Account, other than those funds to be paid to CSSC pursuant hereto, shall be paid to Michigan National and BookCrafters according to their respective interests. In order to allow the Debtor and other interested parties one hundred twenty (120) days time to examine the extent and validity of the claims and liens of Michigan National Bank and BookCrafters, no payment shall be made for one hundred twenty (120) days from the date hereof unless the parties (except CSSC) agree in writing or the court orders otherwise.

11. CSSC shall immediately begin to provide the Debtor with the inventory cards with respect to the Edison Inventory on a daily basis as soon as they are produced and the Debtor shall provide the Committee, Michigan National and BookCrafters with a written physical inventory of the Edison Inventory on or before September 30, 1987 subject to reconcilliation by the Debtor as soon as is practical.

12. Each person signing this Stipulation on behalf of the Debtor, CSSC, the Committee, Michigan National and BookCrafters hereby warrants that he or she is authorized to bind the entity he or she represents to this stipulation and that the entity is authorized to bind itself to this stipulation.

13. CSSC shall immediately deliver to the Debtor the Debtor's catalogs in CSSC's possession, and shall immediately make available for shipment books owned by the Foreign Intelligence Press upon the Debtor's instructions.

14. This stipulation is subject to the approval of the Bankruptcy Court.

15. Upon Bankruptcy Court approval hereof, (a) the above-captioned adversary proceeding shall be deemed dismissed, without costs as to the any party against the other; (b) the provisions of this stipulation which grant to CSSC a lien in the Edison Inventory, the Edison Proceeds, and the Escrow Account and which directs payment to CSSC by Stein and Day shall not be subject to modification; and (c) this stipulation shall be binding upon the parties hereto, their successors and assigns, including, but not limited to, any trustee appoint-

ed in this Chapter 11 case or in any superceding Chapter 7 case; (d) all of the claims raised in the adversary proceeding shall be deemed settled between the parties, and each party hereto releases the other from all such claims; and (e) the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of this stipulation and any claims or disputes arising out of this stipulation may be placed on the court calendar by any party, for a hearing on three (3) business days notice to all of the other parties hereto by hand delivery or telecopier transmission, or other similar means.

16. If any party to this stipulation asserts that there is a breach of the terms of this stipulation then the party asserting the breach shall notify all other parties of the alleged breach.

17. All notices, including copies thereof and other communications hereunder, shall be in writing and delivered by hand, by first class, registered or certified mail, return receipt requested, postage prepaid, or by telex, telecopy or other telegraphic or telephonic means, to the parties at their respective addresses, as follows:

As to the Debtor:
Stein and Day Incorporated
Scarsborough House, Route 9
Briarcliff Manor, New York 10510
Attn: Sol Stein, President

With copies given in like manner to:
Barr and Faerber
664 South Main Street
Spring Valley, New York 10977
Attn: Harvey Barr, Esq.

As to Coordinated Systems and Services Corporation:
Coordinated Systems & Service Corporation
300 Raritan Center Parkway, C.N. 94
Edison, New Jersey 08818
Attn: Peter C. Visceglia, Esq.

With copies given in like manner to:
Ross and Hardies
575 Fifth Avenue, 20th Floor
New York, New York 10017

Attn: Sandra A. Riemer, Esq.
As to Michigan National Bank to their attorneys only:
Drinker, Biddle & Reath
405 Park Avenue
New York, New York 10022
Attn: Gregg J. Borri, Esq.
As to BookCrafters U.S.A., Inc. to their attorneys only:
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York 10153
Attn: Martin J. Bienenstock, Esq.
As to the Creditors' Committee to their attorneys only:
Platzer, Fineberg & Swergold
150 East 52nd Street
New York, New York 10022
Attn: Henry G. Swergold, Esq.

18. This stipulation may be executed in counterparts.

Dated: New York, New York
September 30, 1987

BARR AND FAERBER, ESQS.

By: _____
A Member of the Firm
Attorneys for Stein and Day
Incorporated

ROSS & HARDIES

By: _____
A Member of the Firm
Attorneys for Coordinated
Systems & Services Corporation

DRINKER, BIDDLE & REATH

By: _____
A Member of the Firm
Attorneys for Michigan National
Bank

WEIL, GOTSHAL & MANGES

By: _____
A Member of the Firm
Attorneys for BookCrafters
U.S.A., Inc.

PLATZER, FINEBERG & SWERGOLD

By: _____
A Member of the Firm
Attorneys for Official
Committee of Unsecured
Creditors