**A.V. BY VERSACE, INC., Plaintiff,**

v.

**GIANNI VERSACE, S.p.A. and Alfredo Versace, Defendants.**

**and**

**Gianni Versace, S.p.A., Third–Party Plaintiff,**

v.

**Anthony J. Pellegrino, Patrick Marano, and John Does 1–10, Third–Party Defendants.**

**Gianni Versace, S.p.A., Plaintiff,**

v.

**Alfredo Versace and Foldom International (U.S.A.), Inc., Defendants.**

Nos. 96Civ.9721(PKL)(THK), 98Civ.0123(PKL)(THK).

United States District Court, S.D. New York.

March 6, 2000.

Walsh & Walsh, Hackensack, NJ (John Walsh, of counsel), for A.V. By Versace, Inc.

Quirk and Bakalor, P.C., New York, NY (H. Nicholas Goodman, James M. Andriola, of counsel), for A.V. By Versace, Inc.

Phillips, Nizer, Benjamin, Krim & Ballon LLP, New York, NY (Theodore C. Max, David E. Jacoby, of counsel), for Gianni Versace, S.p.A.

Tunick, Kupferman & Creadore, P.C., New York, NY (Theodore R. Kupferman, of counsel), for Alfredo Versace and Foldom International (U.S.A.), Inc.

## OPINION AND ORDER

LEISURE, District Judge.

Gianni Versace, S.p.A. seeks an order, pursuant to Federal Rule of Civil Procedure 70, Local Civil Rule 83.9, and this Court's inherent power, finding defendants Alfredo Versace and Foldom International (U.S.A.), Inc. in civil contempt for violating a preliminary injunction entered by the Honorable Sidney H. Stein, United States District Judge, in Civil Action No. 98–0123(SHS) (the "*Foldom* Action"). In addition, Gianni moves this Court for leave to amend its answer, counterclaim, and third-party complaint in Civil Action No. 96–9721(PKL) (the "*A.V.* Action"). For the

following reasons, Gianni's application for contempt sanctions is granted with respect to Alfredo Versace and denied with respect to Foldom International (U.S.A.), Inc., and its motion for leave to amend its pleadings is granted.

## BACKGROUND

Gianni Versace, S.p.A. ("Gianni") is a world-famous design house founded in the 1970s by the late Italian designer, Mr. Gianni Versace. Gianni owns a number of famous trademarks incorporating the name "Versace," as well as its signature "Medusa" trademarks. A.V. By Versace, Inc. ("A.V.") is a manufacturer of clothing and athletic shoes bearing the trademarks "A.V. By Versace" and "Alfredo Versace," pursuant to an alleged license with Alfredo Versace ("Mr.Versace"), an Italian citizen and United States resident. Mr. Versace has also been accused of marketing jeans and other items of clothing, as well as cigarettes, in conjunction with codefendant Foldom International (U.S.A.), Inc. ("Foldom"), through the use of various marks confusingly similar to trademarks registered by Gianni in the United States. The parties filed separate lawsuits in December 1996 and January 1998, which were later consolidated by this Court. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* No. 96 Civ. 9721, 1998 WL 832692 (S.D.N.Y.1998), at *1.

## I. The *A.V.* Action

The facts underlying the *A.V.* Action have been set forth in greater detail in this Court's January 28, 1997 Memorandum Order, *A.V. by Versace v. Gianni Versace, S.p.A.,* 1997 WL 31247, at *1 (S.D.N.Y. Jan. 28, 1997), familiarity with which the Court assumes. In December 1996, A.V. commenced the *A.V.* Action after its customer, Kinney Shoe Corporation ("Kinney"), received a cease and desist letter from Gianni's attorneys alleging that Kin-

ney's sales of "A.V. By Versace" and "Alfredo Versace" clothing and shoes infringed various Gianni trademarks. As to Gianni, A.V. sought (1) declaratory relief, declaring that its products do not infringe Gianni's registered trademarks; (2) injunctive relief, enjoining Gianni from sending further "cease and desist" letters to A.V.'s customers; and (3) damages, under theories of unfair competition and tortious interference with contract. *See id.* Against Mr. Versace, A.V. requested (1) declaratory relief, ruling that (a) it has the sole right to use the mark "Alfredo Versace," and (b) if the mark is registered in the United States, it must be assigned the registration; and (2) compensatory and punitive damages. *See id.*

On January 28, 1997, this Court denied A.V.'s request for a preliminary injunction against the two defendants that would have prohibited both from using the mark "Alfredo Versace," based on A.V.'s failure to demonstrate a likelihood of irreparable harm. *See id.* at *2–3. Gianni subsequently filed counterclaims, a cross-claim, and third-party claims of trademark infringement and unfair competition against A.V. and third-party defendants Anthony J. Pelligrino ("Pelligrino") and Patrick Marano ("Marano") (collectively, the "third-party defendants").[1] *See A.V.,* 1998 WL 832692, at *1.

## II. The *Foldom* Action and Judge Stein's Preliminary Injunction

On January 8, 1998, after sending another "cease and desist" letter to Mr. Versace's counsel and to Foldom, Gianni filed a separate lawsuit against Mr. Versace and Foldom, alleging trademark infringement, unfair competition, and trademark dilution in violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c); trademark dilution, pursuant to N.Y. Gen. Bus. Law § 360–*l;* and trademark infringement and unfair competition under New York

---

1. Gianni also filed a third-party claim against Kinney, which in turn counterclaimed. However, pursuant to a settlement agreement executed on July 19, 1999, those claims were dismissed with prejudice. *See* Stipulation and Order, dated Aug. 16, 1999.

common law. *See Foldom* Compl. ¶ 1. In short, Gianni claimed that Mr. Versace and Foldom were manufacturing and selling products that infringed Gianni's registered trademarks, or licensing or franchising such infringing trademarks. *See id.* ¶ 17. These products allegedly included men's and women's suits, jeans, tee-shirts, sweaters, active wear, handbags, leather goods, and packaging bearing the names "AV Versace," "Versace by A.V.," or "Alfredo Versace." *Id.* ¶ 18. Of specific displeasure to Gianni was an advertisement that appeared in the November 12, 1997 issue of *Women's Wear Daily*, soliciting persons to license or franchise trademarks from "AV Versace." *Id.* ¶ 18. By its complaint, Gianni sought a preliminary injunction enjoining Mr. Versace and Foldom from using "its trademarks or trade dress or any designation so similar as likely to cause confusion, mistake or deception," including among others, "Alfredo Versace," "A.V. by Versace," "Versace by A.V." and "A. Versace," *id.* ¶ A, as well as compensatory and punitive damages, *id.* ¶¶ C, E–G. The case was initially assigned to the Honorable Sidney H. Stein, United States District Judge.

On February 4, 1998, Judge Stein granted Gianni's request for a preliminary injunction, issuing his decision from the bench. *See* Max Aff. ¶ 8; Prelim. Inj. at 1; *see also* Order to Show Cause, dated Jan. 12, 1998. During that hearing, defense counsel raised the issue of the injunction's extraterritorial application:

> THE COURT: . . . [Defendants' attorney] Mr. Feldman has raised separate issues in the papers in regard to my ability to adjudicate these issues in regard to Pakistan and Austria, so forth.
>
> MR. MAX: So long as he is here and licensing it there.
>
> THE COURT: If the license is entered into here, I do have authority.
>
> MR. MAX: If he is an actor here, if he wants to move to Austria and do licensing there, I certainly would agree

with your Honor that we have no jurisdiction over him. But as I believe the letter that Mr. Feldman passed up at the last hearing indicates, which dealt with correspondence between Mr. Versace [in] New York and someone in Italy, clearly the spider at the middle of the web is here in New York, so long as he is licensing and franchising his trademark from New York.

> THE COURT: It is a jurisdictional matter. I think you are right. I will let that be. I will let Mr. Feldman convince me otherwise. To the extent that he is directing things be done, I guess that is a pretty basic contract matter, I have jurisdiction to stop him from doing things.

Feb. 4, 1998 Conf. Tr. at 20–21. Yet, Judge Stein declined to rule definitively on the question, and instead asked the parties to provide him with case law, which he expected would clarify the legal principles involved. *See id.* at 24. He did, however, state that "[i]n the absence of [a clear holding from the Second Circuit], the proposed preliminary injunction should cover licensing in the States. For licenses to be entered abroad, let's see what the cases say." *Id.*

Between February 4 and February 9, 1998, both sides submitted letter brief; and proposed orders arguing their respective positions on the issue of the Court's power to reach activities directed from within the United States that take place outside the country. *See* Max Aff. ¶ 14–17 & Exhs. B–D. On February 6, 1998, the attorneys for Foldom and Mr. Versace proposed a change to paragraph 11 of the proposed order (concerning publicity), which would have added the phrase "within the United States." *See* Proposed Prelim. Inj. at 7 (Max Aff., Exh. D). Counsel contended that his proposal was meant "to clarify the issue that this order is not preventing our client from conducting businesses in foreign countries which may allow him to use his name or a variation

thereof as a trademark." Letter from John F. Kaley, Esq. to the Court, dated Feb. 6, 1998, at 2 (Max Aff., Exh. D). Later that day, counsel for Gianni wrote a letter to the Court, objecting to the proposed change, *see id.* at 2–4, to which counsel for defendants replied three days later, *see* Letter from Stephen E. Feldman, Esq. to the Court, dated Feb. 9, 1998, at 2–3 (Max Aff., Exh. D), and which in turn provoked a surreply from Gianni, *see* Letter from Max to the Court, dated Feb. 10, 1998, at 2–3 (Max Aff., Exh. D).

Six days after issuing its oral decision, on February 10, 1998, the Court entered a preliminary injunction, which ordered, *inter alia*, that

> [d]efendants, their officers, agents, servants, employees, representatives, licensees, and attorneys, and all persons in active concert or participation or privity with any of them who receive actual notice of this Order, are hereby enjoined, *pendente lite*, in the United States of America [2] from registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing the use of any of the Versace Trademarks, Versace Trade Dress, or the Medusa Designs,[3] as or as part of a trademark, service mark, business name, or trade name for any product, service, or business, or in such a manner as to create the impression that such name, logo or symbol is the trade name or business name of any designed, manufacturer, distributor, retailer or other business or trademark or service mark for any product or service. . . .

Prelim. Inj., dated Feb. 10, 1998 ("Prelim.Inj.") ¶ 8 (Max Aff., Exh. E); *see also id.* ¶¶ 9, 10 (prohibiting Mr. Versace from using his name as a trademark and re-

stricting the use of his name, other than to identify him as the designer of goods he actually designed); *id.* ¶ 12 (prohibiting defendants from attempting to register various marks and requiring that any pending application be withdrawn or abandoned); *id.* ¶ 13 (prohibiting Mr. Versace from delegating or licensing rights or obligations under the preliminary injunction, subject to limited exceptions); *id.* ¶ 15 (ordering defendants to provide a copy of the Order to "all present and former licensees, franchisees, customers and distributors"). With the exception of paragraph 8, however, no other provision in the Order—including paragraph 11—includes any geographic limitation. *See id.*; Max Aff. ¶ 18.

Subsequently, in a letter dated March 25, 1998, counsel for the two defendants requested a conference with Judge Stein to clarify the scope of the preliminary injunction with regard to its extraterritorial application. Letter from Kaley to the Court, dated Mar. 25, 1998, at 1–3 (Max. Aff., Exh. F). Counsel inquired specifically:

> Under the [preliminary injunction], may Alfredo Versace sign a license agreement while present in his office in New York licensing a foreign entity or concern (*e.g.*, a Japanese or Korean company) to distribute goods bearing the trademark AV Versace or Alfredo Versace outside the United States, in, for example, a country where Alfredo Versace has rights to manufacture and distribute goods bearing either of those trademarks?

*Id.* at 2. Evidently, however, Judge Stein felt there was no need for such a conference, as, on April 10, 1998, by Memorandum Endorsement, he denied Mr. Ver-

---

2. The phrase, "in the United States of America," was originally included in Gianni's proposed paragraph 8, which appears to have been adopted verbatim by the Court. *See* Proposed Prelim. Inj. ¶ 8 (Max Aff., Exh. D). The phrase was proposed by counsel for Gianni before Alfredo Versace's lawyers suggested a similar addition to paragraph 11, *see supra* note 1, and would appear to be completely unrelated to the paragraph 11 proposal.

3. "Versace Trademarks" and "Medusa Designs" are defined in paragraph 2 of the preliminary injunction, while paragraph 3 defines "Versace Trade Dress." *See* Prelim. Inj. ¶¶ 2–3.

sace's "request for 'clarification.'" *Id.* at 1. Gianni now insists that counsel's letter "posed a question that the Court had definitively answered at both the February 4, 1998 hearing and in the February 10, 1998 order." Max. Aff. ¶ 19. Naturally, Mr. Versace disputes Gianni's characterization of its efforts to seek clarification as an attempt to "create ambiguity where none existed." Kupferman Aff. ¶ 14.

On July 30, 1998 Judge Stein stayed the *Foldom* Action, pending the resolution of the *A.V.* Action. In that Order, Judge Stein relied on his determination that Gianni's cross-claim in the *A.V.* Action was "'broad enough to encompass the basic allegations of trademark infringement that are alleged in [the *Foldom* A]ction.'" *A.V.*, 1998 WL 832692, at *1 (quoting Order of July 30, 1998, *Gianni Versace, S.p.A. v. Versace*, 98 Civ. 0123(SHS)).

### III. Consolidation and the Motions Before the Court

Upon Gianni's motion, on December 1, 1998, this Court consolidated the *A.V.* Action with the *Foldom* Action, concluding that "[m]any common questions of both law and fact exists between the [two actions]." *A.V.*, 1998 WL 832692, at *2. The Court further recognized that "[t]he complaint filed by [Gianni] in the *Foldom* Action seeks similar relief [to that of its cross-claim in the *A.V.* Action], overlapping substantially with the cross-claim." *Id.* In addition, the Court lifted the stay on the *Foldom* Action and granted Mr. Versace and Foldom twenty days to answer the *Foldom* complaint.[4] *See id.* at *3.

On November 30, 1998, Gianni brought a motion, by Order to Show Cause, seeking an order adjudging Foldom and Mr. Versace to be in civil contempt of the prelimi-

nary injunction. Gianni contends that the defendants have been violating the terms of Judge Stein's Order since its issuance on February 10, 1998. Specifically, Gianni has accused Mr. Versace and Foldom of engaging in a worldwide campaign of licensing infringements, resulting in the proliferation of infringing goods and advertisements in Korea, Italy, Russia, and beyond. *See* Pl. Mem. at 1.

Discovery in both cases continued under the supervision of the Honorable Naomi Reice Buchwald, United States Magistrate Judge,[5] while Gianni's application for contempt sanctions in the *Foldom* Action was pending. In light of information learned during discovery, in April 1999, Gianni sought leave to amend its answer, counterclaim, and third-party complaint in the *A.V.* Action to assert third-party claims against Transportation Services, Inc. ("TSI"), a Texas corporation, and TSI Equipment, Inc. ("TSIE"), a Delaware corporation, based on evidence that the two had been active participants in A.V.'s infringement scheme. *See* Jacoby Aff. ¶ 2. At a May 7, 1999 hearing, Judge Buchwald granted Gianni leave to file the aforementioned motion. After numerous delays and extensions, Gianni served its motion to amend on July 30, 1999.[6]

### DISCUSSION

### I. Motion for Civil Contempt

It is Gianni's contention that, despite the preliminary injunction, Mr. Versace has continued to direct infringing licensing activity abroad from his center of operations in New York. *See id.* at 2. In particular, it asserts that, pursuant to master license with Universal Licensing, Mr. Versace approved sublicenses permitting various Ko-

---

**4.** The stay did not affect the preliminary injunction. *See* Order dated July 30, 1998 (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204 (2d Cir.1970)).

**5.** Judge Buchwald has since been confirmed as a United States District Judge for the Southern District of New York. The case has

since been reassigned to the Honorable Judge Theodore H. Katz, Chief United States Magistrate Judge.

**6.** A copy of the proposed amended pleading is annexed to the Affidavit of David Jacoby, sworn to on July 30, 1999, as its Exhibit A. *See* Jacoby Aff., Exh. A.

rean entities to manufacture and market products using the name "Alfredo Versace," *see* Max Aff. ¶¶ 23, 26, 35; Max Rep. Aff. ¶ 14; Lee Decl. ¶¶ 9–18 & Exh. A, and attempted to register the "Alfredo Versace" trademark in Korea as recently as July 1998,[7] *see* Max Aff. ¶¶ 25, 27, 31, 37; Max Rep. Aff. ¶ 7. In addition, Gianni complains that an Italian company, Diesse s.r.l. ("Diesse"), has been manufacturing "Alfredo Versace" jeans in Italy, under the authority of a license supposedly granted by Mr. Versace. *See* Max Aff. ¶¶ 42–44; Max Rep. Aff. ¶ 16; de Martinis Decl. ¶¶ 5–15 & Exhs. A, C.[8] Finally, Mr. Versace is said to have employed a German firm, Reemtsma International, to manufacture "V Gold A.V. Versace" cigarettes for sale in Russia, as well as Honnex Tobaccos Limited, to distribute "AV Versace" cigarettes in Hong Kong.[9] *See* Max Aff. ¶¶ 48–59 & Exh. FF; Max Rep. Aff. ¶¶ 18–19; Loo Decl. ¶¶ 4–5 & Exhs. A & B; *see also* Versace Aff. ¶¶ 17–18 (admitting that prior to the Court's order, in 1997, he granted a license to a different German firm to sell cigarettes, pursuant to which two trial loads of cigarettes were sold in Russia and Macau).

In their reply papers, filed on March 19, 1999, Gianni's attorneys cited further alleged violations of the preliminary injunction. For example, there is evidence that Mr. Versace registered "Versace Boutique, Inc." as a corporate name for a Bahamian shell corporation and subsequently applied for Bahamian trademarks, listing his company's location as 57 West 38th Street in New York City. *See* Max Rep. Aff. ¶¶ 8–9; Blair Decl. ¶¶ 1–6 & Exh. A–B. In addition, Gianni offers a letter from Samed Ud Bin Ahmad, marketing director for Time Concepts, P.L., dated August 17, 1998, that implies that "Alfredo Versace" watches were being marketed in the United States, Japan, Korea, Singapore, and Malaysia. *See* Max Rep. Aff. ¶ 17; de Martinis Decl. Exh. D. Gianni further alleges that Mr. Versace has failed to provide notice of the preliminary injunction to all of its present and former licensees, franchisees, customers, and distributors, as it is required to do under paragraph 15 of the preliminary injunction. *See* Max Rep. Aff. ¶ 12.; Iovane Aff. ¶¶ 9, 13 & Exhs. C, E; de Martinis Decl. ¶ 16; Loo Decl. ¶ 5 & Exh. B.

Finally, it appears that various Internet sites have been featuring many of the marks covered by the preliminary injunction. As a consequence, Gianni's attorneys maintain, Mr. Versace's "tidal wave of publicity for the infringing [goods] has reached the United States via the Internet." Max Rep. Aff. ¶ 21. Specifically, a web site managed by Hawksburn Distilleries, which claimed to be "the appointed exclusive distributors for all AV Versace Cigarettes in over twenty-five countries

**7.** Since filing the motion for contempt sanctions, counsel for Gianni claims to have discovered evidence of additional trademark filings in Korea, Japan, Macau, and the Bahamas. *See* Max Rep. Aff. ¶ 7 & Exh. C.

**8.** Gianni also states that on September 5, 1998, an Italian import/export firm known as Pepete s.r.l. placed an advertisement for "Alfredo Versace Jeans" in *Il Giorno*, an Italian newspaper in Milan, "as an accommodation to Alfredo Versace, with whom it had previously done business." Max Aff. ¶ 45; *see also id.* Exh. CC. The request allegedly came from Mr. Versace himself in New York. *See id.* ¶ 45.

Furthermore, Gianni complains that Mr. Versace "has continued to prosecute registrations or extensions of" registrations in Italy.

*See id.* ¶ 46. Specifically, upon information and belief, counsel for Gianni submits that Italian authorities issued a trademark for "V. GOLD A.V. VERSACE" on February 20, 1998, and extended it "international trademark" status on April 20, 1998. *See id.* Finally, counsel also states that on July 16, 1998, Italian authorities issued Mr. Versace a trademark on the phrase "Designated by Alfredo Versace," and granted it "international trademark" status on November 12, 1998.

**9.** Further complicating matters, one of Gianni's lawyers in Hong Kong has averred that he has been informed by at least one retailing executive that "Honnex has been telling would-be customers that Alfredo Versace is the late Gianni Versace's brother." Loo Decl. ¶ 5.

world-wide," invited customers to place orders, without any geographic limitation on distribution, from anywhere around the globe. *Id.;* Iovane Aff. ¶¶ 13–15 & Exh. E. Another site offered "A.V. designed by Alfredo Versace Sports-wear Line Clothing," evidently made in Italy and produced and distributed by Gruppo Manifatture Italiane s.r.l.[10] *See id.* ¶¶ 9–11 & Exh. C. Furthermore, Diesse's web site advertises Mr. Versace's jeans, complete with a certificate of authenticity that closely mimics that which accompanies genuine Gianni products. *See id.* ¶ 12 & Exh. D. These sites were reachable via popular Internet search engines,[11] such as *Lycos* and *Altavista,* through a simply query of the name "Versace." *See* Iovane ¶¶ 9, 12–13 & Exhs. C–D.

Defendants Mr. Versace and Foldom oppose Gianni's motion and urge that sanctions are unwarranted. They argue that (1) Judge Stein's preliminary injunction granted Gianni unnecessarily broad protection of its trademarks and trade dress, *see* Def. Opp. Mem. at 2–3; (2) there is no "clear and convincing" evidence of violations of the order or a failure to reasonably attempt to comply with its requirements, *see id.* at 3–4; and (3) that the injunction cannot be applied to actions undertaken outside the United States, *see id.* at 4–7. Mr. Versace himself avers that none of the allegedly-infringing goods are currently being manufactured or sold in the United States. *See* Versace Aff. ¶ 2.

Moreover, Mr. Versace's counsel attests that, in fact, his client has purposefully refrained from entering into any further foreign licenses and registrations from the United States "out of an abundance of caution." Kupferman Aff. ¶ 16. Nothing in the Order, he maintains, required Mr. Versace to forfeit his existing foreign trademark rights. *See id.* ¶ 17; Versace Aff. ¶¶ 2–3, 10, 16, 20. Finally, he disputes each of Gianni's allegations as either unsupported by the evidence, *see* Kupferman Aff. ¶¶ 21–25, unrelated to his clients' post-February 4, 1998 activities, *see* id. ¶¶ 18–20, 28, 33–34, 37–38, or outside the scope of the injunction, *see id.* ¶¶ 19, 26, 30–32, 35–36, 40.

## A. Standard For a Finding of Civil Contempt

■ Although it is axiomatic that "courts have inherent power to enforce compliance with their lawful orders through civil contempt," *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), this Court's authority to hold a party in contempt is significantly circumscribed. The Supreme Court has warned against sanctioning a party for contempt "where there is a fair ground of doubt as to the wrongfulness of the [party's] conduct." *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885). Thus, "a contempt holding will fail unless the order violated by the contemnor is 'clear and unambiguous,' the proof of non-compliance is 'clear and convincing,' and the contemnor was not reasonably diligent in attempting to comply." *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995).

---

**10.** The site, which listed its business address as 10 West 33rd Street, New York, New York, *see id.* ¶ 10, allowed users to e-mail, fax, or telephone for information concerning these products, *see id.* ¶ 11. Gianni charges that the site violated the preliminary injunction in several respects. For example, the name "ALFREDO VERSACE" was featured in the same size type as "A. V.," in violation of ¶ 10(e); the phrase "designed by" appeared in a different type size and style from "ALFREDO VERSACE," as required by ¶ 10(d); and there is no disclaimer disassociating Mr. Versace from Gianni, in violation of ¶¶ 9(b) and 10(f). *See* Iovane Aff. ¶ 11 & Exh. C.

**11.** The Second Circuit has explained that "[a] search engine will find all web pages on the Internet with a particular word or phrase. Given the current state of search engine technology, that search will often produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 493 (2d Cir.2000).

Only if these three conditions are met may the Court impose contempt sanctions against a party. Even then, constitutional considerations limit the Court's ability to award sanctions that may be deemed punitive in nature. "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Accordingly, an award may not be arbitrary; rather, it must be reasonably related to the facts. *See Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.1982).

## B. Allegations Against Foldom

In its defense, Foldom protests that it was but a mere bystander to any violations by its co-defendant, having had "nothing to do with the violations alleged by plaintiff." Def. Opp. Mem. at 1. As a result, it argues, it "should be released from any consideration of contumacy." *Id.* In an attempt to counter Foldom's assertions, Gianni identifies two facsimile transmissions, apparently sent from Foldom's fax machine, as evidence of Foldom's support of Mr. Versace's ongoing activities in Korea and Russia. *See* Max Aff. ¶¶ 32–33, 49 & Exhs. N, FF. Yet, Foldom's managing director, Paul Law, avers that Foldom had no involvement whatsoever in the transmittal of the two faxes. *See* Law Aff. ¶ 6. Rather, he explains, Mr. Versace had been renting space in Foldom's West 38th Street office, and was therefore afforded unsupervised use of the facsimile machine in Foldom's office.[12] *See id.* Mr. Law

further states that he has asked Mr. Versace to vacate Foldom's office, on account of his "hav[ing] been subjected by [Gianni] to needless anxiety and expenses simply because I had a tenant whom I allowed access to my fax machine." *Id.* ¶ 9.

Gianni's reply notes that (1) Foldom held out Tom Conrad, who had earlier been identified as Mr. Versace's assistant or "right hand," as its sales director, *see* Pl. Rep. Mem. at 8; Max Rep. Aff. ¶ 32 & Exh. J; and (2) a business directory listed a "Paul Low" as the "owner" of Alfredo Versace, Inc.; *see* Pl. Rep. Mem. at 8; Max Rep. Aff. ¶ 35 & Exh. K.[13] Simply put, it is Gianni's contention that Foldom was one of Mr. Versace's many alter egos.

The Court finds, in exercising its wide discretion to determine whether to hold a party in contempt, that the evidence against Foldom is insufficient to warrant contempt sanctions. *See Dunn v. New York State Dep't of Labor*, 47 F.3d 485, 490 (2d Cir.1995). A finding of civil contempt requires "clear and convincing proof of noncompliance with the injunction," and the party seeking contempt charges bears the burden of demonstrating noncompliance. *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir.1984). Aside from a business card and a facsimile signature, Gianni has offered no evidence suggesting that Mr. Versace and Foldom are in fact one and the same. Though the two co-defendants may have previously shared a business relationship, *see, e.g.*, Max Rep. Aff. ¶ 36, there is no proof of contumacious behavior on the part of Foldom. On the present record, it appears that any violation of Judge Stein's Order by Foldom was "inadvertent" and "promptly cured" by the

---

12. In addition, Foldom notes that one of the faxes was sent on December 18, 1997, almost two months prior to the issuance of the preliminary injunction. *See* Law Aff. ¶ 7 & Exh. FF.

13. The Court also observes that Foldom's address "appears on virtually all [of] Alfredo Versace's post-Order licenses and trademark applications." Pl. Rep. Mem. at 8 (citing Max

Rep. Aff. ¶ 14 & Exhs. C, K). Of course, this can be logically explained, as Mr. Versace had apparently been sharing office space with Foldom. *See* Law Aff. ¶¶ 6–7. The shared address does not come close to establishing that Foldom was somehow in league with Mr. Versace with respect to his allegedly contumacious activities.

apparent eviction of Mr. Versace. *See Fiber–Shield Indus., Inc. v. N.Y. Fire–Shield, Inc.*, 189 F.3d 460, 1999 WL 709351, at *2 (2d Cir. Sept. 1, 1999); *see also NLRB v. New Pines, Inc.*, 468 F.2d 427, 430 (2d Cir.1972) ("The violation, if any, was de minimis....."). Therefore, the Court will not hold Foldom in contempt.

### C. Allegations Against Mr. Versace

While the Court finds insufficient evidence to support the imposition of contempt sanctions against Foldom, the evidence submitted by Gianni predominantly implicates Mr. Versace. Having considered the voluminous evidence, it is apparent that Mr. Versace has violated the terms of the preliminary injunction, though not to the extent Gianni suggests. As to the numerous allegations that Mr. Versace has been directing an ongoing overseas campaign of infringement from his center of operations in New York, the Court finds that Judge Stein's Order was not sufficiently "clear and unambiguous" to justify holding Mr. Versace in civil contempt. Likewise, there is no "clear and convincing" evidence of sales or marketing having occurred directly in the United States. On the other hand, however, with regard to advertisements and customer solicitations that reached the United States via the Internet, the Court finds that contempt sanctions are indeed warranted. For the reasons that follow, therefore, the Court will enter an order adjudging Mr. Versace to be in civil contempt.

### 1. Overseas Activities Directed From the United States

■ Gianni's primary contention is that Mr. Versace has continued to mastermind an international campaign of infringing licensing activity from his New York office. Thus, it argues, because Mr. Versace was located within the jurisdiction of the United States courts, Judge Stein properly exercised his power to enjoin Mr. Versace from directing these operations, so long as Mr. Versace remained in this country.

Accordingly, Gianni submits that the preliminary injunction, embodied both in the Court's oral guidance of February 4, 1998 and the February 10, 1998 Order, was clear and unambiguous with respect to activities undertaken within the United States. Though not directly contesting this issue in his opposition brief,[14] Mr. Versace suggests by counsel that if his conduct violated the injunction, "any such violation was inadvertent and the result of ambiguity in the Order as it related to the foreign trademark issues presented by [Gianni's] application." Kupferman Aff. ¶ 42.

The Second Circuit has defined a "clear and unambiguous order" as "one that leaves 'no uncertainty in the minds of those to whom it is addressed,' who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995) (quoting, respectively, *Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir.1988), and *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers and Cement Masons Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir.1989)). In other words, an injunction must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *In re Baldwin–United Corp.*, 770 F.2d 328, 339 (2d Cir.1985). A district court may

---

14. Gianni's reply memorandum correctly notes that Mr. Versace did not formally contest the liability prong of the contempt test in his memorandum in opposition to Gianni's motion. *See* Pl. Rep. Mem. at 23. However, Mr. Versace's argument regarding the Lanham Act's irrelevance to activities conducted overseas effectively challenges Gianni's interpretation of the Order with respect to its extraterritorial reach. *See* Def. Opp. Mem. at 4–7. Moreover, the affidavit of Theodore R. Kupferman, Esq. clearly disputes plaintiff's reading of the Order, thus raising the issue of ambiguity. *See, e.g.,* Kupferman Aff. ¶ 3 ("That is not what the Order provides and is not ... what Judge Stein intended."); *id.* ¶ 14 ("As a result of the language of the Order, there was still an ambiguity as to precisely what was permitted and prohibited by the Order....").

not impose obligations on a party that are not unambiguously mandated by the decree itself. *See King,* 65 F.3d at 1058 (citing *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). Consequently, "[t]he long-standing, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt.'" *Drywall Tapers,* 889 F.2d at 400 (Mahoney, J., concurring in part and dissenting in part) (quoting *Ford v. Kammerer,* 450 F.2d 279, 280 (3d Cir.1971)) (alteration in original).

Reading Judge Stein's Order as a whole, and considering the circumstances surrounding its formation, the Court cannot interpret the injunction to "clearly and unambiguously" cover overseas activities, even those that may have been coordinated from the United States. Although the parties explicitly raised the question of the scope of the Order before Judge Stein and briefed the issue several times for his consideration, *see supra* at 284–85, the resulting preliminary injunction contains "no language within [its] four corners" that conclusively prohibits such overseas activity. *United States v. O'Rourke,* 943 F.2d 180, 189 (2d Cir.1991).

Specifically, counsel for Mr. Versace points to paragraph 8 of the Order, which "enjoined" the "[d]efendants," as well as their agents, employees, and licensees, *"in the United States of America* from registering, attempting to register, using, advertising, marketing, licensing, franchising, promoting or authorizing the use of any of the Versace Trademarks." Prelim. Inj. ¶ 8 (emphasis added). It is unclear, however, whether the phrase "in the United States of America" modifies "enjoined" or whether it modifies "registering, attempting to register, using, advertising, market-

ing, licensing, franchising, promoting or authorizing." If the former, such activities as alleged by Gianni would likely fall within the scope of the Order. Yet, if the latter, so long as the particular use, registration, or licensing took place outside the borders of the United States, there would not appear to be a violation. Still, the bare text does not definitively answer this question.

Nor do the circumstances surrounding the Court's adoption of the parties' proposed orders shed much light on Judge Stein's true intent. It is appropriate for the Court to consider extrinsic evidence as an aid to interpretation of a particular order or judgment if a certain term is ambiguous on its face.[15] *See King,* 65 F.3d at 1059; *O'Rourke,* 943 F.2d at 187. However, the events that precipitated Gianni's application for contempt sanctions do not clarify, but rather further cloud the issue of the injunction's geographic scope. Although the parties discussed the Order's extraterritorial application during the February 4, 1998 hearing, Judge Stein never explicitly ruled on the issue. *See* Feb. 4, 1998 Conf. Tr. at 24; *supra* at 284. Each side thereafter submitted letter briefs offering their respective interpretations of Second Circuit case law; yet, again, the subsequent injunction did not definitively adopt either side's argument.

In particular, although Gianni disagrees, the fact that Judge Stein did not include the proposed amendment advanced by Mr. Versace's attorneys, *see supra* at 284–85, is, in the absence of an express ruling rejecting the proposal, inconclusive. If anything, the Court must construe any possible ambiguity the preliminary injunction against Gianni, as it was the one that "drew the order, chose the language, and presented it to the judge for approval."

---

15. "[S]ince [an] order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the 'four corners' rule...." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (footnote omitted).

*Gluck v. Camden Fire Ins. Ass'n,* 204 F.2d 183, 185 (2d Cir.1953). Under the general rule that a writing should be construed against its drafter, had Gianni truly wanted such activity prohibited, it could easily have proposed and drafted an order that explicitly forbid it. *See id.*

Finally, Judge Stein's refusal to "clarify" the scope of the preliminary injunction apparently left the parties without an adequate understanding as to the scope of the Order. That Mr. Versace's lawyers had to ask the Court for clarification evidences the Order's ambiguity. *See Town of Islip v. Eastern Air Lines, Inc.,* 793 F.2d 79, 83 (2d Cir.1986) (vacating judgment of contempt where oral and written orders "failed to give the airline a clear understanding of what it was legally required to do, and because Eastern made reasonable efforts to seek clarification of the ambiguous order"); *cf. Drywall Tapers,* 889 F.2d at 395 (finding contempt where the party alleging ambiguity had previously complained that the same order was too harsh to comply with).

Gianni's attorneys argue that, because Judge Stein decided the issue in its favor, the Court should ignore Mr. Versace's protestations that the Order did not apply to activities abroad, since "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *United States v. Rylander,* 460 U.S. 752, 756, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) (internal quotes omitted). This Court, however, is in no position to determine the veracity of either party's understanding as to the scope of the injunction, due to the lack of clarity in the Order itself. *See Islip,* 793 F.2d at 83; *Tenen v. Winter,* No. 94-934S, 1996 WL 947560, at *16 (W.D.N.Y. July 23, 1996). Fed.

R.Civ.P. 65(d), which requires, *inter alia,* that an injunction be "specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained," exists so as to "prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." [16] *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.; see also Perfect Fit,* 646 F.2d at 809 ("[V]ague or general injunctions cannot be easily obeyed or effectively and fairly enforced."). Here, neither the "four corners" of Judge Stein's Order, nor the circumstances surrounding its issuance, definitively establish whether the actions attributed to Mr. Versace were prohibited.

In sum, though the Court would probably side with Gianni were it forced to choose among the two competing interpretations, neither the written Order of February 10, 1998 nor the Court's pronouncements at the February 4, 1998 conference settled the debate over the preliminary injunction's application to activities abroad. Accordingly, with respect to allegations of overseas infringement directed from the United States, Gianni's motion for a finding of contempt must be denied.

### 2. Activities Within the United States

In a supplemental affidavit sworn to on April 16, 1999, Gianni's attorney contends that Mr. Versace's April 12, 1999 responses to interrogatories "demonstrate further infringing conduct undertaken within the state of New York which violates the preliminary injunction." Max

---

**16.** "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).

Supp. Aff. ¶ 2. Specifically, counsel cites Mr. Versace's supplemental response to Gianni's Interrogatory Number 28, in which Mr. Versace identified as materials using the name "Alfredo Versace" or the "Alfredo Versace" mark: (1) an invoice from Minuteman Press, located at 885 Hempstead Turnpike, in Franklin Square, New York, dated February 19, 1999, for the printing of "prospective labels/hang tags and business cards;"[17] (2) six enlarged color sketches or prospective labels/hang tags; and (3) a copy of his new business card. *See id.* ¶ 5 & Exh. A. Both the invoice and the sketches were apparently signed and approved by Mr. Versace personally. *See id.* ¶ 7 & Exh. B. It is Gianni's contention that these documents prove that Foldom and Mr. Versace are "actively violating this Court's injunction" by producing infringing materials in the United States, since the sketches appear to lack the disclaimer required under the preliminary injunction, as well as—with one exception—the necessary phrase "Designed by Alfredo Versace." *Id.* ¶ 8.

Yet, the connection between the allegedly infringing sketches and the February 19, 1999 invoice is tenuous at best. Counsel for Mr. Versace has since clarified that the sketches were in fact produced (i) prior to the issuance of the Order, (ii) in Japan, and (iii) were intended for use in Japan, *see* Letter from Kupferman to the Court, dated Apr. 19, 1999, at 2. Rather, he explains, the invoice refers to noninfringing hang tags previously provided to Gianni's counsel in earlier discovery. *See id.;* Letter from Max to the Court, dated Apr. 23, 1999, Exh. B; Letter from Kupferman to the Court, dated Apr. 23, 1999, at 2–3.[18] Gianni offers no evidence to the contrary.

Regardless of whether Gianni's suppositions about the true origin of these sketches are correct or confused, it has certainly not met the standard necessary to establish contempt. A party may be held in contempt only if it is demonstrated by "clear and convincing" evidence that the party violated a "clear and unambiguous" order of the court. *See City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n,* 170 F.3d 279, 282 (2d Cir.1999); *see also EEOC v. Local 638,* 81 F.3d 1162, 1174 (2d Cir.1996) (requiring proof by "clear and convincing evidence, not just by a preponderance of the evidence"). Gianni's contention that the sketches supplied by Mr. Versace were in some manner "used" in the United States, in contravention of paragraphs 8 and 10 of the preliminary injunction, finds little, if any factual support. Rather, its evidence merely shows that (1) Mr. Versace purchased certain "tags" and business cards from a New York printer, but not that these materials were in any way infringing; and (2) various sketches were designed that do not comply with the requirements of the Order, but not that the sketches were used in the United States or even printed subsequent to the date of the injunction. Moreover, as concerns materials printed for use in the United States, there is no evidence that Mr. Versace has not been reasonably diligent in attempting to comply with Judge Stein's Order. Therefore, given the absence of supporting proof, Gianni's "mere assertion" of a violation fails to

---

**17.** The invoice also includes a "P.O. Date" of February 10, 1999, which suggests that the materials were ordered on February 10, 1999. The invoice is addressed to Alfredo Versace, 57 West 38th Street, New York, New York, and marked "Attn: Alfredo."

**18.** Gianni reads too much into Mr. Versace's business cards, having suggested that his recent order of 2,000 business cards refutes Paul Law's assertion regarding Mr. Versace's imminent eviction from Foldom's offices. *See*

Max. Supp. Aff. ¶ 9. The cards incorporate Mr. Versace's new trademark, and, as his attorney suggests, "it is understandable that he would want to issue his new business card to as many people as possible as quickly as possible in order to publicize his new trademark." Letter from Kupferman to the Court, dated Apr. 19, 1999, at 2. The size of the order is also unilluminating, as it may have been more cost effective for Mr. Versace order in bulk. *See id.*

"meet the 'clear and convincing' standard required to support a finding of contempt." *Tap Publications, Inc. v. Chinese Yellow Pages, Inc.*, No. 95 Civ. 5043, 1996 WL 509718, at *2 (S.D.N.Y. Sept. 9, 1996).

### 3. Internet Sales and Advertising

■] While there is insufficient evidence to support a finding of contempt with respect to the bulk of Gianni's allegations, the Court is more disturbed by recent evidence of online sales and advertisements of "Alfredo Versace" products. Although these Internet sites presumably operate from servers in foreign countries, they are accessible by any web browser in the United States. The Court thus finds that Mr. Versace has marketed various products featuring the infringing marks on the World Wide Web since entry of the preliminary injunction. *See supra* at 287–88. Furthermore, there is little doubt that such efforts persist to this date.[19]

Despite originating overseas, under federal trademark law, this type of online infringement is deemed to have occurred in the United States, and therefore is plainly covered by the preliminary injunction. In fact, Judge Shira A. Scheindlin faced an analogous situation in *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 939 F.Supp. 1032, 1036–40, 1044–45 (S.D.N.Y.1996). In that case, Playboy accused an Italian company of operating an Internet site in Italy using the label "PLAYMEN," in violation of a fifteen year-old order enjoining it from employing the word "in connection with the sale, offering for sale or distributing in the United States, importing into or exporting from the United States, English language publications and related products." *Id.* at 1034. After rejecting the defendant's analogy of its customers "boarding a plane, landing in Italy, and purchasing a copy of PLAYMEN magazine," Judge Scheindlin held that "merely posting pictorial images on a computer server in Italy" could constitute active solicitation of American customers and distribution within the United States. *Id.* at 1039.[20] Although the Court allowed the defendant to continue operating its web site from abroad, it ordered the company to deny access to users in the United States. *See id.* at 1040, 1044–45.

Mr. Versace's international e-commerce clearly falls within the three-part test required for a finding of contempt. First, Judge Stein's Order clearly proscribes this activity. Paragraph 8 of the preliminary injunction enjoined Mr. Versace from using any mark "confusingly similar" to the Versace Trademarks. The appearance of the "Alfredo Versace" name in cyberspace is certainly likely to confuse Internet users, particularly in light of Mr. Versace's failure to adhere to the conditions for the use of his name prescribed by paragraphs 9(a) and (b) and 10(b), (d), (e), and (f), *see supra* note 10. Although the text of paragraph 8 limits its geographical scope to actions undertaken "in the United States," because these Internet sites were capable of being accessed from within the U.S. borders, this condition is satisfied. *See*

19. *See, e.g., Diesse Abbigliamento Alfredo Versace Pantaloni Griffe Oggettistica Vestiti Camicia Giacca* <http://www.genesi.it/diesse/VERSACE.HTM> (last visited Feb. 29, 2000).

20. *See also Hard Rock Cafe Int'l (USA) Inc. v. Morton*, No. 97 Civ. 9483, 1999 WL 717995, at *26 (S.D.N.Y. Sept. 9, 1999) (ruling that "advertis[ing] and offer[ing] CDs for sale to a global audience" over the Internet violated a licensing agreement that limited defendant's rights to use plaintiff's trademarks to a number of identified states and regions); *Planned Parenthood Fed'n of Am. v. Bucci*, No. 97 Civ. 0629, 1997 WL 133313, at *3 n. 7 (S.D.N.Y.

Mar. 24, 1997) ("[The defendant's] activities over the Internet occur everywhere that Internet users may access his web site."), *aff'd*, 152 F.3d 920 (2d Cir.), *cert. denied*, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998); *Comedy III Prods., Inc. v. Class Publications, Inc.*, No. 95 Civ. 5552, 1996 WL 219636, at *2–*3 (S.D.N.Y. May 1, 1996) (finding defendant in contempt where his company violated an order preliminarily the advertising or selling of "merchandise bearing the names, likenesses and trademarks of the Three Stooges" by advertising clothing on the Internet).

*Playboy*, 939 F.Supp. at 1039.[21] Similarly, paragraph 12 prohibits Mr. Versace from using or permitting others to use any of the so-called Infringing Marks (including "Alfredo Versace," "AV Versace," "Versace," and "A. Versace Jeans"), and paragraph 13 bars him from assigning his rights or obligations under the Order to any other person. Thus, whether Mr. Versace himself authorized these web sites, or merely licensed his name to others, its use for these particular products is precisely the type of infringement the Order sought to prevent.[22]

Furthermore, the evidence of Mr. Versace's contumacious online activity is "clear and convincing," as he has not denied responsibility for licensing these marks for continued use overseas. Likewise, his repeated use of the "Alfredo Versace" name without the disclaimers required by paragraphs 9 and 10, coupled with his failure to ensure that web sites operated from overseas could not be accessed in the United States, reveals his lack of diligence in complying with the injunction.[23] As such, the three-part test for a finding of civil contempt is satisfied.

As Judge Scheindlein warned in *Playboy*, "[c]yberspace is not a 'safe haven' from which [Mr. Versace] may flout the Court's injunction." *Id.* at 1040. Allowing

Mr. Versace to contravene the clear intent of the preliminary injunction by permitting the sale and advertisement of goods in the United States through the use of a foreign server would emasculate Judge Stein's Order. *See id.* at 1037. He must be held accountable for Internet transmissions that have the capability of reaching the United States. Therefore, the Court concludes that Mr. Versace has violated paragraphs 8, 9(a) and (b), 10(b), (d), (e), and (f), 12, and 13 of the preliminary injunction by using offshore Internet sites to advertise and distribute his products in the United States. As such, as concerns these particular allegations, contempt sanctions are warranted.

### D. Remedy

 In a civil contempt proceeding, the Court has "broad discretion to fashion an appropriate coercive remedy ... based on the nature of the harm and the probable effect of alternative sanctions." *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir.1984); *see also Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985). The Court may either order sanctions which are necessary to coerce compliance with its previous orders or fashion remedies that "compensate the complainant for losses sustained." *United*

21. Moreover, it should be noted that the Order's failure to refer to the Internet specifically does not limit its applicability to this new medium. *See Playboy*, 939 F.Supp. at 1037.

22. It should also be noted the fact that web sites advertising Alfredo Versace products could be reached via popular search engines imposed an affirmative obligation on Mr. Versace to purge all infringing references to "Alfredo Versace" from the search engines themselves. Because the search engines continued to direct users towards web sites that were in violation of Judge Stein's Order, the appearance of the "Alfredo Versace" name on the search engines was itself a violation, as it constitutes "using, advertising, marketing, [and] promoting" of a Versace Trademark, on the Internet, in violation of paragraph 8 of the preliminary injunction. *Cf. Nettis Environ. Ltd. v. IWI, Inc.*, 46 F.Supp.2d 722, 727–28 (N.D.Ohio 1999) (finding defendant in civil

contempt for failing to take affirmative action to "undo" its associations with various search engines). Clearly, then, Mr. Versace was not sufficiently "diligent and energetic in attempting to accomplish what was ordered." *Local 530*, 889 F.2d at 396.

23. That Mr. Versace's conduct may not have been willful does not preclude an award of contempt sanctions, "since 'sanctions for civil contempt can be imposed without a finding of wilfulness.'" *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir.1989) (quoting *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 39 (2d Cir.1989)). "The fact that the prohibited act was done inadvertently or in good faith ... does not preclude a citation for civil contempt, for the sanction is remedial in nature." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 128 n. 2 (2d Cir.1979).

*Mine Workers*, 330 U.S. at 303–04, 67 S.Ct. 677; *see also Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979) ("Generally, the sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance."). In determining whether sanctions are appropriate, the Court must consider whether the ends justify the means. Specifically, the Second Circuit has instructed district courts to weigh "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987).

■ Unlike the situation in *Playboy*, there is no evidence before the Court concerning the feasibility of limiting access to online "Alfredo Versace" sales and advertisements to persons outside the United States. *Compare Hard Rock Cafe*, 1999 WL 717995, at *27 (recognizing lack of evidence of feasibility of limiting access by region), *with Playboy*, 939 F.Supp. at 1044–45 (ordering defendant who violated the Court's injunction to either shut down its web site or prohibit access to users from the United States). As it does not appear that there is any practical alternative other than to require Mr. Versace to purge all references to the Infringing Marks throughout cyberspace, Mr. Versace must ensure that all references to "Alfredo Versace" that do not comply with Judge Stein's Order are removed from the Internet. Therefore, Mr. Versace is hereby ordered, within thirty days of the date of this Order, to take all reasonable steps to disable every Internet site that in any way employs any of the Versace Trademarks, Versace Trade Dress, or the Medusa Designs, or any mark or design confusingly similar thereto, or any of the Infringing Marks identified in paragraph 6 of the preliminary injunction, in such a manner that would violate the terms of the Judge Stein's Order, consistent with the findings in this Order. Within thirty days, Mr. Versace shall file an affidavit describing his efforts to delete any infringing references and noting any references he was unable to remove. *See Nettis*, 46 F.Supp.2d at 729.

In addition, Mr. Versace shall also pay a compensatory fine to Gianni, equal to any and all profits earned from the sale of products advertised on any Internet site, unless he can demonstrate that the advertisement or sale was in undertaken compliance with Judge Stein's Order. The Second Circuit has approved the use of compensatory sanctions based on the defendant's profits, without requiring proof of actual injury to the plaintiff, under a theory of unjust enrichment. *See Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, 6 (2d Cir.1989). Thus, within thirty days of the date of this Order, Mr. Versace shall file a sworn statement detailing (i) all net profits derived from licensing and sales over the Internet throughout the world from February 4, 1998 to date; (ii) all outstanding agreements concerning the use of any trademark on the Internet, subject to the preliminary injunction; (iii) all business activity since February 4, 1998 as to such trademarks; and (iv) all monies received through the licensing and use of the trademarks at issue.

Finally, the Court finds that these online violations were wilful, as Mr. Versace should have "had sufficient cause to doubt the[ir] legality." *Playboy*, 939 F.Supp. at 1041, 1045. Therefore, Mr. Versace shall remit to Gianni the sum of one-third (*i.e.*, 33.3%) of its costs and attorneys' fees incurred in making the instant application. *See Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996); *N.A. Sales*, 736 F.2d at 858; *Vuitton*, 592 F.2d at 130–31. Within thirty days of the date of this Order, Gianni shall serve and file a memorandum and affidavits in support thereof itemizing its total

attorneys' fees and costs associated with this application.

If any of these conditions has not been met within the stated thirty day period, Mr. Versace shall pay to Gianni a fine of $1,000 each day thereafter until it fully complies with this Order. *See Playboy*, 939 F.Supp. at 1041. In addition, Gianni may seek any further sanctions if it feels it has not been adequately compensated for any losses it actually sustained.

## II. Motion for Leave to Amend

For reasons apparently unrelated to its motion for contempt sanctions, Gianni moves the Court for leave to amend its answer, counterclaim, and third-party complaint in the *A.V.* Action, so as to assert third-party claims against TSI and TSIE. Gianni asserts that it has learned through discovery that TSI and TSIE were active participants in the alleged infringement. *See* Jacoby Aff. ¶ 2. In particular, according to counsel for Gianni, TSI and TSIE are entities controlled by third-party defendant Pelligrino. *See id.* ¶¶ 4–6; Jacoby Rep. Aff. ¶ 7. Consequently, A.V. shared a close relationship with TSI, such that TSI employees allegedly (1) incorporated A.V., *see* Jacoby Aff. ¶ 8; and (2) installed A.V.'s computer systems, *see id.* ¶¶ 12–13; (3) signed A.V.'s quarterly federal tax withholding forms and insurance claims, *see id.* ¶ 14; and (4) acted as A.V.'s general counsel, *see id.* ¶¶ 15–16; and (5) authorized payments from TSI on A.V.'s loans. Furthermore, Gianni contends that TSI itself (6) bought and financed the manufacture of "Alfredo Versace" shoes in Korea, *see id.* ¶¶ 9, 20–21 & Exhs. Q–R, Jacoby Rep. Aff. ¶ 8; (7) handled A.V.'s shipping, *see* Jacoby Aff. ¶ 11; (8) paid A.V.'s bills, *see id.* ¶ 11; and (9) along with TSIE, played a "vital role" in financing A.V.'s operations by securing more than $500,000 in A.V.'s debt, *see id.* ¶¶ 18–19, 22 & Exhs. P–S. As it is doubtful that A.V. has retained assets sufficient to satisfy a judgment against it, Gianni seeks to add TSI and TSIE as third-party defendants, to the extent ei-

ther hold assets used to facilitate infringement by A.V. *See id.* ¶ 25.

A.V., the plaintiff and counterclaim-defendant, opposes the motion, as do third-party defendants Pelligrino and Marano (collectively, the "motion opponents"). They maintain that TSI and TSIE had no role in A.V.'s operations or financing—as A.V. had its own independent and proper corporate structure—and thus any responsibility on their part for alleged infringing activities was at most tangential. *See* A.V. Opp. Mem. at 1, 5–6; Third–Party Defendants' Opp. Mem. ("TPD Opp. Mem.") at 4, 8–9, 11–12; Buoniconti Aff. ¶¶ 19, 23, 25; Walsh Aff. ¶¶ 2–3, 5–15, 17–20, 22 & Exhs. A–P. Rather, according to the motion opponents, TSI and TSIE merely served as guarantors, not purchasers of merchandise. *See* Walsh Aff. ¶¶ 17–20, 24.

Furthermore, the motion opponents charge that Gianni is effectively attempting to pierce A.V.'s corporate veil in order to reach completely separate business entities, and thereby interjecting a new legal theory that will require additional pleading and discovery, to the prejudice of A.V. and the third-party defendants. *See* A.V. Opp. Mem. at 5, 6; TPD Opp. Mem. at 12–13; Buoniconti Aff. ¶ 26. Finally, they also protest that the introduction of additional third-party defendants at this stage of the litigation will unduly prolong the *A.V.* Action and unnecessarily extend discovery. *See* A.V. Opp. Mem. at 4; TPD Opp. Mem. at 13; Buoniconti Aff. ¶¶ 3, 5, 14, 17; Walsh Aff. ¶ 21.

### A. Standard for Granting Leave to Amend

Federal Rule of Civil Procedure 15(a) permits a party to amend a pleading "by leave of the court." The Rule provides that leave to amend "shall be freely given when justice so requires." *Id.* "Nonetheless, a motion to amend may be denied due to undue delay or if it would cause undue prejudice to the opposing party." *Ashjari v. NYNEX Corp.*, 82 F.3d 898, 1999 WL 464977, at *1 (2nd Cir. June

22, 1999). In addition, the Court has discretion to deny leave to amend where the proposed amendment would be futile. *See Marchi v. Board of Coop. Educ. Servs.*, 173 F.3d 469, 477 (2d Cir.1999); *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' ").

## B. Futility

Although there is a general presumption in favor of permitting amendment, this Court has broad discretion in deciding whether to allow Gianni to amend its pleadings. Leave to amend may be denied where it appears that the proposed amendments are "unlikely to be productive." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993); *see also Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir.1984) ("That the amendments would not serve any purpose is a valid ground to deny a motion for leave to amend."). Thus, if the proposed amended complaint would be subject to "immediate dismissal" for failure to state a claim or on some other ground, the Court will not permit the amendment. *Jones v. New York State Div. of Military & Naval Affairs*, 166 F.3d 45, 55 (2d Cir.1999). By contrast, " 'if [Gianni] has at least colorable grounds for relief, justice does so require' " that its motion be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch*

*Commodities Inc.*, 748 F.2d 774, 783 (2d Cir.1984) (quoting *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Dev. Fund Co.*, 608 F.2d 28, 41 (2d Cir. 1979)).

The motion opponents have endeavored to explain the somewhat suspicious relationship between TSI, TSIE, and A.V. They have not, however, demonstrated Gianni's inability to state a claim for relief against TSI and TSIE. The motion opponents maintain that Gianni's amended third-party complaint does not allege that either TSI or TSIE ever "engaged in the manufacturing, marketing or sale of the allegedly infringing items." Opp. Mem. at 6. Furthermore, they argue that Gianni cannot establish that it lost sales as a result of the alleged infringement.

While Gianni may not yet be able to show the existence of triable issues of material fact, the standard for granting leave to amend is far more liberal than the showing required to survive summary judgment. Gianni has pleaded its claims with substantial specificity and has adduced several facts suggesting that TSI and TSIE did play a significant role in A.V.'s operations. The owner of a trademark "is entitled to protection against all who knowingly play a significant role in accomplishing the unlawful purpose." *Stix Prods. Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 500 (S.D.N.Y.1968) (Weinfeld, J.) (citing *Cuervo v. Jacob Henkell Co.*, 50 F. 471, 472 (C.C.S.D.N.Y.1892) ("Complainant is clearly entitled to an injunction against all who knowingly combine together to accomplish that purpose.")).[24] It certainly "lies within the realm of possibility" that, upon further

---

**24.** Contrary to the motion opponents' implication, Judge Weinfeld's opinion in *Stix Products* is directly on point. Not unlike A.V. and its apparent relationship with TSI and TSIE, "Stix was launched upon its career with the affirmative aid of Firestone." *Stix Prods.*, 295 F.Supp. at 500. Moreover, as the Court noted, "[e]ver since Stix's entry into the self-adhesive decorative plastic field, Firestone has played an active and essential role in

Stix's affairs with respect to the products in question, providing Stix with extensive financial and technical assistance." *Id.* Firestone also supplied Stix with materials necessary to manufacture its products, and provided legal counsel to guide Stix in its infringing activities. *See id.* In turn, Stix kept Firestone informed of its policies and activities. The two worked hand-in-hand, just as Gianni alleges TSI and TSIE assisted A.V.

discovery, Gianni might be able to prove that TSI and TSIE knowingly played an indispensable role in A.V.'s infringing activities. *Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir.1999). Moreover, as the parties vigorously dispute the legitimacy of A.V.'s corporate formalities, the Court cannot at this point say that Gianni will be unable to demonstrate an adequate basis for disregarding A.V.'s corporate structure and "piercing the corporate veil."

As such, the amendments have not been shown to be futile. Any deficiencies in the pleadings can best be considered in the context of a motion for summary judgment. *See WIXT Television, Inc. v. Meredith Corp.*, 506 F.Supp. 1003, 1010 (S.D.N.Y.1980).[25]

## C. Undue Prejudice

■ The motion opponents also contend that allowing the amendments will prejudice their case. However, prejudice alone is insufficient to justify a denial of leave to amend; rather, the necessary showing is "*undue* prejudice to the opposing party." *Foman*, 371 U.S. at 182, 83 S.Ct. 227 (emphasis added); *see also MacDraw, Inc. v. CIT Group Equip. Financing, Inc.*, 157 F.3d 956, 962 (2d Cir.1998). " 'Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.' " *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993) (quoting *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). In determining whether a party's interests have been unduly prejudiced, the Second Circuit has instructed district courts to consider "whether the assertion

of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350.

None of these factors are implicated by the instant motion. No trial date has yet been set, nor has discovery been completed. Although the proposed amendments would implead additional parties, Gianni's claims against TSI and TSIE do not raise factual claims unrelated to the events its original third-party complaint. *Cf. Clark v. World Cable Communications, Inc.*, 166 F.3d 1199, 1998 WL 907904, at *3 (2d Cir. Dec. 23, 1998). In fact, there is no indication—and, furthermore, no showing by the motion opponents—that the addition of TSI and TSIE would in any way materially affect the duration or scope of discovery. Regardless, even if discovery were prolonged, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Ill. Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1255 (2d Cir.1989) (citing *S.S. Silberblatt*, 608 F.2d 28 at 43). Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute "undue prejudice." *Block*, 988 F.2d at 351. Therefore, the motion opponents have offered nothing to suggest that leave to amend should not be "freely granted." Fed.R.Civ.P. 15(a).

## CONCLUSION

For the foregoing reasons, Gianni's motion for a finding of civil contempt is

---

**25.** The motion opponents also argue that efforts to obtain injunctive relief against TSI and TSIE will be futile, on account of a Stipulation and Order entered into by the parties and adopted by this Court on June 19, 1997. In that Stipulation, Gianni accepted on the representations of A.V. and the third-party defendants and agreed to "refrain[ ] from seeking preliminary injunctive relief" against them. Stipulation & Order, dated June 19, 1997, at ¶ 3 (Jacoby Rep. Aff., Exh. F); *see*

*also* TPD Opp. Mem. at 6. Yet, the motion opponents' argument is unavailing. First, the injunction to which A.V., Marano, and Pelligrino consented is merely an injunction *pendente lite*. Gianni never waived its right to pursue permanent injunctive relief against the motion opponents upon the completion of the litigation. Second, Gianni never agreed not to seek preliminary injunctive relief against other persons or entities who were not parties to the agreement, such as TSI and TSIE.

**300**

HEREBY DENIED with respect to Foldom, and HEREBY GRANTED with respect to Alfredo Versace. Moreover, Gianni's motion for leave to amend its pleadings in the *A.V.* Action is HEREBY GRANTED. Gianni shall serve and file its amended pleadings within fourteen days of the date of this Order.

**SO ORDERED.**